# BRASWELL *v.* UNITED STATES

No. 87–3. Argued March 1, 1988—Decided June 22, 1988

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and SCALIA, JJ., joined, *post*, p. 119.

*Michael S. Fawer* argued the cause for petitioner. With him on the brief was *Herbert V. Larson, Jr.*

*Roy T. Englert, Jr.,* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Weld, Deputy Solicitor General Bryson,* and *Joel M. Gershowitz.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents the question whether the custodian of corporate records may resist a subpoena for such records on the ground that the act of production would incriminate him in violation of the Fifth Amendment. We conclude that he may not.

From 1965 to 1980, petitioner Randy Braswell operated his business—which comprises the sale and purchase of equip-

---

**David S. Rudolf* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae.*

ment, land, timber, and oil and gas interests—as a sole proprietorship. In 1980, he incorporated Worldwide Machinery Sales, Inc., a Mississippi corporation, and began conducting the business through that entity. In 1981, he formed a second Mississippi corporation, Worldwide Purchasing, Inc., and funded that corporation with the 100 percent interest he held in Worldwide Machinery. Petitioner was and is the sole shareholder of Worldwide Purchasing, Inc.

Both companies are active corporations, maintaining their current status with the State of Mississippi, filing corporate tax returns, and keeping current corporate books and records. In compliance with Mississippi law, both corporations have three directors, petitioner, his wife, and his mother. Although his wife and mother are secretary-treasurer and vice-president of the corporations, respectively, neither has any authority over the business affairs of either corporation.

In August 1986, a federal grand jury issued a subpoena to "Randy Braswell, President Worldwide Machinery Sales, Inc. [and] Worldwide Purchasing, Inc.," App. 6, requiring petitioner to produce the books and records of the two corporations.[1] The subpoena provided that petitioner could deliver the records to the agent serving the subpoena, and did not require petitioner to testify. Petitioner moved to quash the subpoena, arguing that the act of producing the records would incriminate him in violation of his Fifth Amendment privilege against self-incrimination. The District Court denied the motion to quash, ruling that the "collective entity doctrine" prevented petitioner from asserting that his act of producing the corporations' records was protected by the

---

[1] The subpoena requested the following: receipts and disbursement journals; general ledger and subsidiaries; accounts receivable/accounts payable ledgers, cards, and all customer data; bank records of savings and checking accounts, including statements, checks, and deposit tickets; contracts, invoices—sales and purchase—conveyances, and correspondence; minutes and stock books and ledgers; loan disclosure statements and agreements; liability ledgers; and retained copies of Forms 1120, W–2, W–4, 1099, 940 and 941.

Fifth Amendment. The court rejected petitioner's argument that the collective entity doctrine does not apply when a corporation is so small that it constitutes nothing more than the individual's alter ego.

The United States Court of Appeals for the Fifth Circuit affirmed, citing *Bellis* v. *United States*, 417 U. S. 85, 88 (1974), for the proposition that a corporation's records custodian may not claim a Fifth Amendment privilege no matter how small the corporation may be. The Court of Appeals declared that *Bellis* retained vitality following *United States* v. *Doe*, 465 U. S. 605 (1984), and therefore, "Braswell, as custodian of corporate documents, has no act of production privilege under the fifth amendment regarding corporate documents." *In re Grand Jury Proceedings*, 814 F. 2d 190, 193 (1987). We granted certiorari to resolve a conflict among the Courts of Appeals.[2] 484 U. S. 814 (1987). We now affirm.

There is no question but that the contents of the subpoenaed business records are not privileged. See *Doe, supra; Fisher* v. *United States*, 425 U. S. 391 (1976). Similarly, petitioner asserts no self-incrimination claim on behalf of the corporations; it is well established that such artificial entities are not protected by the Fifth Amendment. *Bellis, supra.* Petitioner instead relies solely upon the argument that his

---

[2] Compare *In re Grand Jury Proceedings (Morganstern)*, 771 F. 2d 143 (CA6) (en banc), cert. denied, 474 U. S. 1033 (1985); *In re Grand Jury Subpoena (85-W-71-5)*, 784 F. 2d 857 (CA8 1986), cert. dism'd *sub nom. See* v. *United States*, 479 U. S. 1048 (1987); *United States* v. *Malis*, 737 F. 2d 1511 (CA9 1984); *In re Grand Jury Proceedings (Vargas)*, 727 F. 2d 941 (CA10), cert. denied, 469 U. S. 819 (1984), which have refused to recognize a Fifth Amendment privilege, with *United States* v. *Antonio J. Sancetta, M. D., P. C.*, 788 F. 2d 67, 74 (CA2 1986); *In re Grand Jury Matter (Brown)*, 768 F. 2d 525 (CA3 1985) (en banc); *United States* v. *Lang*, 792 F. 2d 1235, 1240 (CA4), cert. denied, 479 U. S. 985 (1986); *In re Grand Jury No. 86-3 (Will Roberts Corp.)*, 816 F. 2d 569, 573 (CA11 1987); *In re Sealed Case*, 266 U. S. App. D. C. 30, 832 F. 2d 1268 (1987), which have recognized a Fifth Amendment privilege.

act of producing the documents has independent testimonial significance, which would incriminate him individually, and that the Fifth Amendment prohibits Government compulsion of that act. The bases for this argument are extrapolated from the decisions of this Court in *Fisher, supra,* and *Doe, supra.*

In *Fisher,* the Court was presented with the question whether an attorney may resist a subpoena demanding that he produce tax records which had been entrusted to him by his client. The records in question had been prepared by the client's accountants. In analyzing the Fifth Amendment claim forwarded by the attorney, the Court considered whether the client-taxpayer would have had a valid Fifth Amendment claim had he retained the records and the subpoena been issued to him. After explaining that the Fifth Amendment prohibits "compelling a person to give 'testimony' that incriminates him," 425 U. S., at 409, the Court rejected the argument that the contents of the records were protected. The Court, however, went on to observe:

> "The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena. *Curcio* v. *United States,* 354 U. S. 118, 125 (1957). The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the taxpayer are both 'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment. These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof." *Id.,* at 410.

The Court concluded that under the "facts and circumstances" there presented, the act of producing the accountants' papers would not "involve testimonial self-incrimination." *Id.*, at 411.[3]

Eight years later, in *United States* v. *Doe, supra,* the Court revisited the question, this time in the context of a claim by a sole proprietor that the compelled production of business records would run afoul of the Fifth Amendment. After rejecting the contention that the contents of the records were themselves protected, the Court proceeded to address whether respondent's act of producing the records would constitute protected testimonial incrimination. The Court concluded that respondent had established a valid Fifth Amendment claim. It deferred to the lower courts, which had found that enforcing the subpoenas at issue would provide the Government valuable information: By producing the records, respondent would admit that the records existed, were in his possession, and were authentic. 465 U. S., at 613, n. 11.

Had petitioner conducted his business as a sole proprietorship, *Doe* would require that he be provided the opportunity to show that his act of production would entail testimonial self-incrimination. But petitioner has operated his business through the corporate form, and we have long recognized that, for purposes of the Fifth Amendment, corporations and other collective entities are treated differently from individuals. This doctrine—known as the collective entity rule—has a lengthy and distinguished pedigree.

---

[3] After observing that the papers in question had been prepared by the taxpayer's accountants, the Court noted: "The existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." 425 U. S., at 411. Nor would the taxpayer's production of the papers serve to authenticate or vouch for the accuracy of the accountants' work. *Id.*, at 413.

The rule was first articulated by the Court in the case of *Hale* v. *Henkel*, 201 U. S. 43 (1906). Hale, a corporate officer, had been served with a subpoena ordering him to produce corporate records and to testify concerning certain corporate transactions. Although Hale was protected by personal immunity, he sought to resist the demand for the records by interposing a Fifth Amendment privilege on behalf of the corporation. The Court rejected that argument: "[W]e are of the opinion that there is a clear distinction . . . between an individual and a corporation, and . . . the latter has no right to refuse to submit its books and papers for an examination at the suit of the State." *Id.*, at 74. The Court explained that the corporation "is a creature of the State," *ibid.*, with powers limited by the State. As such, the State may, in the exercise of its right to oversee the corporation, demand the production of corporate records. *Id.*, at 75.

The ruling in *Hale* represented a limitation on the prior holding in *Boyd* v. *United States*, 116 U. S. 616 (1886), which involved a court order directing partners to produce an invoice received by the partnership. The partners had produced the invoice, but steadfastly maintained that the court order ran afoul of the Fifth Amendment. This Court agreed. After concluding that the order transgressed the Fourth Amendment, the Court declared: "[A] compulsory production of the *private* books and papers of the owner of goods sought to be forfeited . . . is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution . . . ." *Id.*, at 634–635 (emphasis added). *Hale* carved an exception out of *Boyd* by establishing that corporate books and records are not "private papers" protected by the Fifth Amendment.

Although *Hale* settled that a corporation has no Fifth Amendment privilege, the Court did not address whether a corporate officer could resist a subpoena for corporate records by invoking his personal privilege—Hale had been protected by immunity. In *Wilson* v. *United States*, 221 U. S.

361 (1911), the Court answered that question in the negative. There, a grand jury investigating Wilson had issued a subpoena to a corporation demanding the production of corporate letterpress copybooks, which Wilson, the corporation's president, possessed. Wilson refused to produce the books, arguing that the Fifth Amendment prohibited compulsory production of personally incriminating books that he held and controlled. The Court rejected this argument, observing first that the records sought were not private or personal, but rather belonged to the corporation. The Court continued:

> "[Wilson] held the corporate books subject to the corporate duty. If the corporation were guilty of misconduct, he could not withhold its books to save it; and if he were implicated in the violations of law, he could not withhold the books to protect himself from the effect of their disclosures. The [State's] reserved power of visitation would seriously be embarrassed, if not wholly defeated in its effective exercise, if guilty officers could refuse inspection of the records and papers of the corporation. No personal privilege to which they are entitled requires such a conclusion. . . . [T]he visitatorial power which exists with respect to the corporation of necessity reaches the corporate books without regard to the conduct of the custodian." *Id.*, at 384–385.

> ". . . When [Wilson] became president of the corporation and as such held and used its books for the transaction of its business committed to his charge, he was at all times subject to its direction, and the books continuously remained under its control. If another took his place his custody would yield. He could assert no personal right to retain the corporate books against any demand of government which the corporation was bound to recognize." *Id.*, at 385.

In a companion case, *Dreier* v. *United States*, 221 U. S. 394 (1911), the Court applied the holding in *Wilson* to a Fifth

Amendment attack on a subpoena addressed to the corporate custodian. Although the subpoena in *Wilson* had been addressed to the corporation, the Court found the distinction irrelevant: "Dreier was not entitled to refuse the production of the corporate records. By virtue of the fact that they were the documents of the corporation in his custody, and not his private papers, he was under the obligation to produce them when called for by proper process." 221 U. S., at 400.

The next significant step in the development of the collective entity rule occurred in *United States* v. *White*, 322 U. S. 694 (1944), in which the Court held that a labor union is a collective entity unprotected by the Fifth Amendment. There, a grand jury had issued a subpoena addressed to a union requiring the production of certain union records. White, an assistant supervisor of the union, appeared before the grand jury and declined to produce the documents "'upon the ground that they might tend to incriminate [the union], myself as an officer thereof, or individually.'" *Id.*, at 696.

We upheld an order of contempt against White, reasoning first that the Fifth Amendment privilege applies only to natural individuals and protects only private papers. Representatives of a "collective group" act as agents "[a]nd the official records and documents of the organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally." *Id.*, at 699. With this principle in mind, the Court turned to whether a union is a collective group:

> "The test . . . is whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only. If so, the privilege cannot be in-

voked on behalf of the organization or its representatives in their official capacity. Labor unions—national or local, incorporated or unincorporated—clearly meet that test." *Id.*, at 701

In applying the collective entity rule to unincorporated associations such as unions, the Court jettisoned reliance on the visitatorial powers of the State over corporations owing their existence to the State—one of the bases for earlier decisions. See *id.*, at 700–701.

The frontiers of the collective entity rule were expanded even further in *Bellis* v. *United States*, 417 U. S. 85 (1974), in which the Court ruled that a partner in a small partnership could not properly refuse to produce partnership records. Bellis, one of the members of a three-person law firm that had previously been dissolved, was served with a subpoena directing him to produce partnership records he possessed. The District Court held Bellis in contempt when he refused to produce the partnership's financial books and records. We upheld the contempt order. After rehearsing prior precedent involving corporations and unincorporated associations, the Court examined the partnership form and observed that it had many of the incidents found relevant in prior collective entity decisions. The Court suggested that the test articulated in *White, supra,* for determining the applicability of the Fifth Amendment to organizations was "not particularly helpful in the broad range of cases." 417 U. S., at 100. The Court rejected the notion that the "formulation in *White* can be reduced to a simple proposition based solely upon the size of the organization. It is well settled that no privilege can be claimed by the custodian of corporate records, regardless of how small the corporation may be." *Ibid.* Bellis held the partnership's financial records in "a representative capacity," *id.*, at 101, and therefore, "his personal privilege against compulsory self-incrimination is inapplicable." *Ibid.*

The plain mandate of these decisions is that without regard to whether the subpoena is addressed to the corporation, or

as here, to the individual in his capacity as a custodian, see *Dreier, supra; Bellis, supra,* a corporate custodian such as petitioner may not resist a subpoena for corporate records on Fifth Amendment grounds. Petitioner argues, however, that this rule falls in the wake of *Fisher* v. *United States,* 425 U. S. 391 (1976), and *United States* v. *Doe,* 465 U. S. 605 (1984). In essence, petitioner's argument is as follows: In response to *Boyd* v. *United States,* 116 U. S. 616 (1886), with its privacy rationale shielding personal books and records, the Court developed the collective entity rule, which declares simply that corporate records are not private and therefore are not protected by the Fifth Amendment. The collective entity decisions were concerned with the contents of the documents subpoenaed, however, and not with the act of production. In *Fisher* and *Doe,* the Court moved away from the privacy-based collective entity rule, replacing it with a compelled-testimony standard under which the contents of business documents are never privileged but the act of producing the documents may be. Under this new regime, the act of production privilege is available without regard to the entity whose records are being sought. See *In re Grand Jury Matter (Brown),* 768 F. 2d 525, 528 (CA3 1985) (en banc) ("*[Fisher* and *Doe]* make the significant factor, for the privilege against self-incrimination, neither the nature of entity which owns the documents, nor the contents of documents, but rather the communicative or noncommunicative nature of the arguably incriminating disclosures sought to be compelled").

To be sure, the holding in *Fisher*—later reaffirmed in *Doe*—embarked upon a new course of Fifth Amendment analysis. See *Fisher, supra,* at 409. We cannot agree, however, that it rendered the collective entity rule obsolete. The agency rationale undergirding the collective entity decisions, in which custodians asserted that production of entity records would incriminate them personally, survives. From *Wilson* forward, the Court has consistently recognized that the cus-

todian of corporate or entity records holds those documents in a representative rather than a personal capacity. Artificial entities such as corporations may act only through their agents, *Bellis, supra,* at 90, and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government. Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege.

The *Wilson* Court declared: "[B]y virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection." 221 U. S., at 382. "Nothing more is demanded than that the appellant should perform the obligations pertaining to his custody and should produce the books which he holds in his official capacity in accordance with the requirements of the subpoena." *Id.,* at 386.

This theme was echoed in *White:*

"But individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations. In their official capacity, therefore, they have no privilege against self-incrimination. And the official records and documents of the organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production

of the papers might tend to incriminate them personally." 322 U. S., at 699.[4]

In *Dreier,* 221 U. S. 394 (1911), and *Bellis,* 417 U. S. 85 (1974), the subpoenas were addressed to the custodians and demanded that they produce the records sought. In both cases, the custodian's act of producing the documents would "tacitly admi[t] their existence and their location in the hands of their possessor," *Fisher, supra,* at 411–412. Nevertheless, the Court rejected the Fifth Amendment claims advanced by the custodians. Although the Court did not focus on the testimonial aspect of the act of production, we do not think such a focus would have affected the results reached. "It is well settled that no privilege can be claimed by the custodian of corporate records . . . ." *Bellis, supra,* at 100.

Indeed, the opinion in *Fisher*—upon which petitioner places primary reliance[5]—indicates that the custodian of corporate records may not interpose a Fifth Amendment objection to

---

[4] See also *Bellis* v. *United States,* 417 U. S. 85, 88 (1974) ("[A]n individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally"); *Essgee Co. of China* v. *United States,* 262 U. S. 151, 158 (1923) ("[T]he cases of *Hale* v. *Henkel,* 201 U. S. 43, *Wilson* v. *United States,* 221 U. S. 361, and *Wheeler* v. *United States,* 226 U. S. 478, show clearly that an officer of a corporation in whose custody are its books and papers is given no right to object to the production of the corporate records because they may disclose his guilt. He does not hold them in his private capacity and is not, therefore, protected against their production or against a writ requiring him as agent of the corporation to produce them").

[5] Petitioner also offers *United States* v. *Doe,* 465 U. S. 605 (1984), as support for his position, but that decision is plainly inapposite. The *Doe* opinion begins by explaining that the question presented for review is "whether, and to what extent, the Fifth Amendment privilege against compelled self-incrimination applies to the business records of a *sole proprietorship.*" *Id.,* at 606 (emphasis added). A sole proprietor does not hold records in a representative capacity. Thus, the absence of any discussion of the collective entity rule can in no way be thought a suggestion that the status of the holder of the records is irrelevant.

the compelled production of corporate records, even though the act of production may prove personally incriminating. The *Fisher* Court cited the collective entity decisions with approval and offered those decisions to support the conclusion that the production of the accountant's workpapers would "not . . . involve testimonial self-incrimination." 425 U. S., at 411. The Court observed: "This Court has . . . time and again allowed subpoenas against the custodian of corporate documents or those belonging to other collective entities such as unions and partnerships and those of bankrupt businesses over claims that the documents will incriminate the custodian despite the fact that producing the documents tacitly admits their existence and their location in the hands of their possessor." *Id.*, at 411–412. The Court later noted that "in *Wilson, Dreier, White, Bellis,* and *In re Harris,* [221 U. S. 274 (1911)], the custodian of corporate, union, or partnership books or those of a bankrupt business was ordered to respond to a subpoena for the business' books even though doing so involved a 'representation that the documents produced are those demanded by the subpoena,' *Curcio* v. *United States,* 354 U. S., at 125." *Id.*, at 413 (citations omitted). In a footnote, the Court explained: "In these cases compliance with the subpoena is required even though the books have been kept by the person subpoenaed and his producing them would itself be sufficient authentication to permit their introduction against him." *Id.*, at 413, n. 14. The Court thus reaffirmed the obligation of a corporate custodian to comply with a subpoena addressed to him.

That point was reiterated by JUSTICE BRENNAN in his concurrence in *Fisher.* *Id.*, at 429 (concurring in judgment). Although JUSTICE BRENNAN disagreed with the majority as to its use of the collective entity cases to support the proposition that the act of production is not testimonial, he nonetheless acknowledged that a custodian may not resist a subpoena

on the ground that the act of production would be incriminating. "Nothing in the language of [the collective entity] cases, either expressly or impliedly, indicates that the act of production with respect to the records of business entities is insufficiently testimonial for purposes of the Fifth Amendment. At most, those issues, though considered, were disposed of on the ground, not that production was insufficiently testimonial, but that one in control of the records of an artificial organization undertakes an obligation with respect to those records foreclosing any exercise of his privilege." *Id.*, at 429–430; see also *id.*, at 430, n. 9. Thus, whether one concludes—as did the Court—that a custodian's production of corporate records is deemed not to constitute testimonial self-incrimination, or instead that a custodian waives the right to exercise the privilege, the lesson of *Fisher* is clear: A custodian may not resist a subpoena for corporate records on Fifth Amendment grounds.

Petitioner also attempts to extract support for his contention from *Curcio* v. *United States,* 354 U. S. 118 (1957). But rather than bolstering petitioner's argument, we think *Curcio* substantiates the Government's position. Curcio had been served with two subpoenas addressed to him in his capacity as secretary-treasurer of a local union, which was under investigation. One subpoena required that he produce union books, the other that he testify. Curcio appeared before the grand jury, stated that the books were not in his possession, and refused to answer any questions as to their whereabouts. Curcio was held in contempt for refusing to answer the questions propounded. We reversed the contempt citation, rejecting the Government's argument "that the representative duty which required the production of union records in the *White* case requires the giving of oral testimony by the custodian." *Id.*, at 123.

Petitioner asserts that our *Curcio* decision stands for the proposition that although the contents of a collective entity's

records are unprivileged, a representative of a collective entity cannot be required to provide testimony about those records. It follows, according to petitioner, that because *Fisher* recognizes that the act of production is potentially testimonial, such an act may not be compelled if it would tend to incriminate the representative personally. We find this reading of *Curcio* flawed.

The *Curcio* Court made clear that with respect to a custodian of a collective entity's records, the line drawn was between oral testimony and other forms of incrimination. "A custodian, by assuming the duties of his office, undertakes the obligation to produce the books of which he is custodian in response to a rightful exercise of the State's visitorial powers. But he cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own *oral testimony*." 354 U. S., at 123–124 (emphasis added).[6]

In distinguishing those cases in which a corporate officer was required to produce corporate records and merely identify them by oral testimony, the Court showed that it understood the testimonial nature of the act of production: "The custodian's act of producing books or records in response to a subpoena *duces tecum* is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission in evidence merely makes explicit what is implicit in the production itself." *Id.*, at 125. In the face of this recognition, the Court nonetheless noted: "In this case petitioner might have been proceeded against for his failure

---

[6] See also 354 U. S., at 124–125 ("There is no hint in [the collective entity] decisions that a custodian of corporate or association books waives his constitutional privilege as to oral testimony by assuming the duties of his office. By accepting custodianship of records he 'has voluntarily assumed a duty which overrides his claim of privilege' *only* with respect to the production of the records themselves. *Wilson* v. *United States,* 221 U. S. 361, 380") (emphasis in original).

to produce the records demanded by the subpoena *duces tecum.*"[7] *Id.*, at 127, n. 7. As JUSTICE BRENNAN later observed in his concurrence in *Fisher:* "The Court in *Curcio,* however, apparently did not note any self-incrimination problem [with the testimonial significance of the act of production] because of the undertaking by the custodian with respect to the documents." 425 U. S., at 430, n. 9.[8]

We note further that recognizing a Fifth Amendment privilege on behalf of the records custodians of collective entities would have a detrimental impact on the Government's efforts to prosecute "white-collar crime," one of the most serious problems confronting law enforcement authorities.[9] "The greater portion of evidence of wrongdoing by an organization or its representatives is usually found in the official records and documents of that organization. Were the cloak of the privilege to be thrown around these impersonal records and documents, effective enforcement of many federal and state laws would be impossible." *White,* 322 U. S., at 700. If

---

[7] The dissent's suggestion that we have extracted from *Curcio* a distinction between oral testimony and act of production testimony that is nowhere found in the *Curcio* opinion, see *post,* at 126, simply ignores this part of *Curcio.* Similarly, the dissent pays mere lipservice to the agency rationale supporting an unbroken chain of collective entity decisions. We have consistently held that for Fifth Amendment purposes a corporate custodian acts in a representative capacity when he produces corporate documents under the compulsion of a subpoena. The dissent's failure to recognize this principle and its suggestion that petitioner was not called upon to act in his capacity as an agent of the corporations cannot be squared with our previous decisions.

[8] Doubtless, the compelled production of the records at issue in the subsequent *Bellis* decision would have had testimonial implications; the Court nonetheless upheld the contempt order. *Bellis* v. *United States,* 417 U. S. 85 (1974).

[9] White-collar crime is "the most serious and all-pervasive crime problem in America today." Conyers, Corporate and White-Collar Crime: A View by the Chairman of the House Subcommittee on Crime, 17 Am. Crim. L. Rev. 287, 288 (1980). Although this statement was made in 1980, there is no reason to think the problem has diminished in the meantime.

custodians could assert a privilege, authorities would be stymied not only in their enforcement efforts against those individuals but also in their prosecutions of organizations. In *Bellis,* the Court observed: "In view of the inescapable fact that an artificial entity can only act to produce its records through its individual officers or agents, recognition of the individual's claim of privilege with respect to the financial records of the organization would substantially undermine the unchallenged rule that the organization itself is not entitled to claim any Fifth Amendment privilege, and largely frustrate legitimate governmental regulation of such organizations." 417 U. S., at 90.

Petitioner suggests, however, that these concerns can be minimized by the simple expedient of either granting the custodian statutory immunity as to the act of production, 18 U. S. C. §§ 6002, 6003, or addressing the subpoena to the corporation and allowing it to chose an agent to produce the records who can do so without incriminating himself. We think neither proposal satisfactorily addresses these concerns. Taking the last first, it is no doubt true that if a subpoena is addressed to a corporation, the corporation "must find some means by which to comply because no Fifth Amendment defense is available to it." *In re Sealed Case,* 266 U. S. App. D. C. 30, 44, n. 9, 832 F. 2d 1268, 1282, n. 9 (1987). The means most commonly used to comply is the appointment of an alternate custodian. See, *e. g., In re Two Grand Jury Subpoenae Duces Tecum,* 769 F. 2d 52, 57 (CA2 1985); *United States* v. *Lang,* 792 F. 2d 1235, 1240–1241 (CA4), cert. denied, 479 U. S. 985 (1986); *In re Grand Jury No. 86–3 (Will Roberts Corp.),* 816 F. 2d 569, 573 (CA11 1987). But petitioner insists he cannot be required to aid the appointed custodian in his search for the demanded records, for any statement to the surrogate would itself be testimonial and incriminating. If this is correct, then petitioner's "solution" is a chimera. In situations such as this—where the corporate custodian is likely the only person with knowledge

about the demanded documents — the appointment of a surrogate will simply not ensure that the documents sought will ever reach the grand jury room; the appointed custodian will essentially be sent on an unguided search.

This problem is eliminated if the Government grants the subpoenaed custodian statutory immunity for the testimonial aspects of his act of production. But that "solution" also entails a significant drawback. All of the evidence obtained under a grant of immunity to the custodian may of course be used freely against the corporation, but if the Government has any thought of prosecuting the custodian, a grant of act of production immunity can have serious consequences. Testimony obtained pursuant to a grant of statutory use immunity may be used neither directly nor derivatively. 18 U. S. C. § 6002; *Kastigar* v. *United States*, 406 U. S. 441 (1972). And "[o]ne raising a claim under [the federal immunity] statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Id.*, at 461–462. Even in cases where the Government does not employ the immunized testimony for any purpose — direct or derivative — against the witness, the Government's inability to meet the "heavy burden" it bears may result in the preclusion of crucial evidence that was obtained legitimately.[10]

Although a corporate custodian is not entitled to resist a subpoena on the ground that his act of production will be personally incriminating, we do think certain consequences flow from the fact that the custodian's act of production is one in

---

[10] The dissent asserts that recognition of an act of production privilege on behalf of corporate custodians will not seriously undermine law enforcement efforts directed against those custodians because only the custodian's act of production need be immunized. See *post*, at 130. But the burden of proving an independent source that a grant of immunity places on the Government could, in our view, have just such a deleterious effect on law enforcement efforts.

his representative rather than personal capacity. Because the custodian acts as a representative, the act is deemed one of the corporation and not the individual. Therefore, the Government concedes, as it must, that it may make no evidentiary use of the "individual act" against the individual. For example, in a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by one particular individual, the custodian. The Government has the right, however, to use the corporation's act of production against the custodian. The Government may offer testimony—for example, from the process server who delivered the subpoena and from the individual who received the records—establishing that the corporation produced the records subpoenaed. The jury may draw from the corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena. And if the defendant held a prominent position within the corporation that produced the records, the jury may, just as it would had someone else produced the documents, reasonably infer that he had possession of the documents or knowledge of their contents. Because the jury is not told that the defendant produced the records, any nexus between the defendant and the documents results solely from the corporation's act of production and other evidence in the case.[11]

---

[11] We reject the suggestion that the limitation on the evidentiary use of the custodian's act of production is the equivalent of constructive use immunity barred under our decision in *Doe*, 465 U. S., at 616–617. Rather, the limitation is a necessary concomitant of the notion that a corporate custodian acts as an agent and not an individual when he produces corporate records in response to a subpoena addressed to him in his representative capacity.

We leave open the question whether the agency rationale supports compelling a custodian to produce corporate records when the custodian is able to establish, by showing for example that he is the sole employee and offi-

Consistent with our precedent, the United States Court of Appeals for the Fifth Circuit ruled that petitioner could not resist the subpoena for corporate documents on the ground that the act of production might tend to incriminate him. The judgment is therefore

*Affirmed.*

JUSTICE KENNEDY, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE SCALIA join, dissenting.

Our long course of decisions concerning artificial entities and the Fifth Amendment served us well. It illuminated two of the critical foundations for the constitutional guarantee against self-incrimination: first, that it is an explicit right of a natural person, protecting the realm of human thought and expression; second, that it is confined to governmental compulsion.

It is regrettable that the very line of cases which at last matured to teach these principles is now invoked to curtail them, for the Court rules that a natural person forfeits the privilege in a criminal investigation directed against him and that the Government may use compulsion to elicit testimonial assertions from a person who faces the threat of criminal proceedings. A case that might have served as the paradigmatic expression of the purposes served by the Fifth Amendment instead is used to obscure them.

The Court today denies an individual his Fifth Amendment privilege against self-incrimination in order to vindicate the rule that a collective entity which employs him has no such privilege itself. To reach this ironic conclusion, the majority must blur an analytic clarity in Fifth Amendment doctrine that has taken almost a century to emerge. After holding that corporate employment strips the individual of his privilege, the Court then attempts to restore some measure of protection by its judicial creation of a new zone of immunity

---

cer of the corporation, that the jury would inevitably conclude that he produced the records.

in some vaguely defined circumstances. This exercise admits what the Court denied in the first place, namely, that compelled compliance with the subpoena implicates the Fifth Amendment self-incrimination privilege.

The majority's apparent reasoning is that collective entities have no privilege and so their employees must have none either. The Court holds that a corporate agent must incriminate himself even when he is named in the subpoena and is a target of the investigation, and even when it is conceded that compliance requires compelled, personal, testimonial, incriminating assertions. I disagree with that conclusion; find no precedent for it; maintain that if there is a likelihood of personal self-incrimination the narrow use immunity permitted by statute can be granted without frustrating the investigation of collective entities; and submit that basic Fifth Amendment principles should not be avoided and manipulated, which is the necessary effect of this decision.

## I

There is some common ground in this case. All accept the longstanding rule that labor unions, corporations, partnerships, and other collective entities have no Fifth Amendment self-incrimination privilege; that a natural person cannot assert such a privilege on their behalf; and that the contents of business records prepared without compulsion can be used to incriminate even a natural person without implicating Fifth Amendment concerns. Further, all appear to concede or at least submit the case to us on the assumption that the act of producing the subpoenaed documents will effect personal incrimination of Randy Braswell, the individual to whom the subpoena is directed.

The petitioner's assertion of the Fifth Amendment privilege against the forced production of documents is based not on any contention that their contents will incriminate him but instead upon the unchallenged premise that the act of production will do so. When the case is presented on this assump-

tion, there exists no historical or logical relation between the so-called collective entity rule and the individual's claim of privilege. A brief review of the foundational elements of the Self-Incrimination Clause and of our cases respecting collective entities is a necessary starting point.

A

In *Boyd* v. *United States*, 116 U. S. 616 (1886), we held that the compelled disclosure of the contents of "private papers" (which in *Boyd* was a business invoice), *id.*, at 622, was prohibited not only by the Fifth Amendment but by the Fourth Amendment as well. The decision in *Boyd* generated nearly a century of doctrinal ambiguity as we explored its rationale and sought to define its protection for the contents of business records under the Fifth Amendment.

That effort was not always successful. As we recently recognized, *Boyd*'s reasoning is in many respects inconsistent with our present understanding of the Fourth and Fifth Amendments, and "[s]everal of *Boyd*'s express or implicit declarations have not stood the test of time." *Fisher* v. *United States*, 425 U. S. 391, 407 (1976). Its essential premise was rejected four years ago, when we held that the contents of business records produced by subpoena are not privileged under the Fifth Amendment, absent some showing that the documents were prepared under compulsion. *United States* v. *Doe*, 465 U. S. 605, 610–611, n. 8 (1984) *(Doe I)*. Our holding followed from a straightforward reading of the Fifth Amendment privilege. We held that unless the Government has somehow compelled the preparation of a business document, nothing in the Fifth Amendment prohibits the use of the writing in a criminal investigation or prosecution. *Id.*, at 610–612.

A subpoena does not, however, seek to compel creation of a document; it compels its production. We recognized this distinction in *Fisher*, holding that the act of producing documents itself may communicate information separate from the

documents' contents and that such communication, in some circumstances, is compelled testimony. An individual who produces documents may be asserting that they satisfy the general description in the subpoena, or that they were in his possession or under his control. Those assertions can convey information about that individual's knowledge and state of mind as effectively as spoken statements, and the Fifth Amendment protects individuals from having such assertions compelled by their own acts.

This is well-settled law, or so I had assumed. In *Doe I*, for example, when we reviewed a claim of Fifth Amendment privilege asserted by a sole proprietor in response to a Government subpoena for his business records, our opinion announced two principal holdings. First, we unequivocally rejected the notion, derived from *Boyd*, that any protection attached to their contents. 465 U. S., at 612. Second, in reliance on the findings of the District Court that production would be testimonial and self-incriminating, we upheld the claim that the act of producing these documents was privileged. *Id.*, at 613–614. Our second holding did not depend on who owned the papers, how they were created, or what they said; instead, we rested on the fact that "the act of producing the documents would involve testimonial self-incrimination." *Id.*, at 613. That principle ought to be sufficient to resolve the case before us.

The majority does not challenge the assumption that compliance with the subpoena here would require acts of testimonial self-incrimination from Braswell; indeed, the Government itself made this assumption in submitting its argument. Tr. of Oral Arg. 26, 36. The question presented, therefore, is whether an individual may be compelled, simply by virtue of his status as a corporate custodian, to perform a testimonial act which will incriminate him personally. The majority relies entirely on the collective entity rule in holding that such compulsion is constitutional.

## B

The collective entity rule provides no support for the majority's holding. The rule, as the majority chooses to call it, actually comprises three distinct propositions, none of which is relevant to the claim in this case. First, since *Hale* v. *Henkel*, 201 U. S. 43 (1906), it has been understood that a corporation has no Fifth Amendment privilege and cannot resist compelled production of its documents on grounds that it will be incriminated by their release. Second, our subsequent opinions show the collective entity principle is not confined to corporations, and we apply it as well to labor unions, *United States* v. *White*, 322 U. S. 694 (1944), and partnerships, *Bellis* v. *United States*, 417 U. S. 85 (1974). Finally, in *Wilson* v. *United States*, 221 U. S. 361 (1911), we extended the rule beyond the collective entity itself and rejected an assertion of privilege by a corporate custodian who had claimed that the disclosure of the contents of subpoenaed corporate documents would incriminate him. *Id.*, at 363. In none of the collective entity cases cited by the majority, and in none that I have found, were we presented with a claim that the custodian would be incriminated by the act of production, in contrast to the contents of the documents.

The distinction is central. Our holding in *Wilson* was premised squarely on the fact that the custodian's claim rested on the potential for incrimination in the documents' contents, and we reasoned that the State's visitatorial powers over corporations included the authority to inspect corporate books. We compared the issue to that presented by cases involving public papers, explaining that "where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him." *Id.*, at 382. Our decision in *Wilson* and in later collective entity cases reflected, I believe, the Court's understandable unease with drawing too close a connection between an indi-

vidual and an artificial entity. On a more practical level, the Court was also unwilling to draw too close a connection between the custodian and the contents of business documents over which he had temporary control but which belonged to his employer, often were prepared by others, and in all events were prepared voluntarily. This last factor became the focus of our analysis in *Fisher*, where we made clear that the applicability of the Fifth Amendment privilege depends on compulsion. *Fisher* put to rest the notion that a privilege may be claimed with respect to the contents of business records that were voluntarily prepared.

The act of producing documents stands on an altogether different footing. While a custodian has no necessary relation to the contents of documents within his control, the act of production is inescapably his own. Production is the precise act compelled by the subpoena, and obedience, in some cases, will require the custodian's own testimonial assertions. That was the basis of our recognition of the privilege in *Doe I*. The entity possessing the documents in *Doe I* was, as the majority points out, a sole proprietorship, not a corporation, partnership, or labor union. But the potential for self-incrimination inheres in the act demanded of the individual, and as a consequence the nature of the entity is irrelevant to determining whether there is ground for the privilege.

A holding that the privilege against self-incrimination applies in the context of this case is required by the precedents, and not, as the Government and the majority suggest, inconsistent with them. The collective entity rule established in *Hale* v. *Henkel*, and extended in *White* and *Bellis*, remains valid. It also continues to be the rule, as we held in *Wilson*, that custodians of a collective entity are not permitted to claim a personal privilege with respect to the contents of entity records, although that rule now derives not from the unprotected status of collective entities but from the more rational principle, established by *Fisher* and *Doe I* and now

recognized, that no one may claim a privilege with respect to the contents of business records not created by compulsion.

The question before us is not the existence of the collective entity rule, but whether it contains any principle which overrides the personal Fifth Amendment privilege of someone compelled to give incriminating testimony. Our precedents establish a firm basis for assertion of the privilege. Randy Braswell, like the respondent in *Doe I*, is being asked to draw upon his personal knowledge to identify and to deliver documents which are responsive to the Government's subpoena. Once the Government concedes there are testimonial consequences implicit in the act of production, it cannot escape the conclusion that compliance with the subpoena is indisputably Braswell's own act. To suggest otherwise "is to confuse metaphor with reality." *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of California*, 475 U. S. 1, 33 (1986) (REHNQUIST, J., dissenting).

## C

The testimonial act demanded of petitioner in this case must be analyzed under the same principles applicable to other forms of compelled testimony. In *Curcio* v. *United States*, 354 U. S. 118 (1957), we reviewed a judgment holding a union custodian in criminal contempt for failing to give oral testimony regarding the location and possession of books and records he had been ordered to produce. *White* had already established that a labor union was as much a collective entity for Fifth Amendment purposes as a corporation, and the Government argued in *Curcio* that the custodian could not claim a personal privilege because he was performing only a "representative duty" on behalf of the collective entity to which he belonged. Brief for United States in *Curcio* v. *United States*, O. T. 1956, No. 260, p. 17. We rejected that argument and reversed the judgment below. We stated:

> "[F]orcing the custodian to testify orally as to the whereabouts of nonproduced records requires him to disclose

the contents of his own mind. He might be compelled to convict himself out of his own mouth. That is contrary to the spirit and letter of the Fifth Amendment." *Curcio, supra,* at 128.

We confront the same Fifth Amendment claim here. The majority is able to distinguish *Curcio* only by giving much apparent weight to the words "out of his own mouth," reading *Curcio* to stand for the proposition that the Constitution treats oral testimony differently than it does other forms of assertion. There is no basis in the text or history of the Fifth Amendment for such a distinction. The Self-Incrimination Clause speaks of compelled "testimony," and has always been understood to apply to testimony in all its forms. *Doe* v. *United States, post,* at 209–210, n. 8 *(Doe II).* Physical acts will constitute testimony if they probe the state of mind, memory, perception, or cognition of the witness. The Court should not retreat from the plain implications of this rule and hold that such testimony may be compelled, even when self-incriminating, simply because it is not spoken.

The distinction established by *Curcio, supra,* is not, of course, between oral and other forms of testimony; rather it is between a subpoena which compels a person to "disclose the contents of his own mind," through words or actions, and one which does not. *Id.,* at 128. A custodian who is incriminated simply by the contents of the documents he has physically transmitted has not been compelled to disclose his memory or perception or cognition. A custodian who is incriminated by the personal knowledge he communicates in locating and selecting the document demanded in a Government subpoena has been compelled to testify in the most elemental, constitutional sense.

### D

Recognition of the privilege here would also avoid adoption of the majority's metaphysical progression, which, I respectfully submit, is flawed. Beginning from ordinary prin-

ciples of agency, the majority proceeds to the conclusion that when a corporate employee, or an employee of a labor union or partnership, complies with a subpoena for production of documents, his act is necessarily and solely the act of the entity. That premise, of course, is at odds with the principle under which oral testimony in *Curcio* properly was deemed privileged.

Since the custodian in *Curcio* had been asked to provide testimony on the union's behalf and not his own, the Government argued, as it again argues here, that the attempted compulsion was constitutionally permissible because Curcio was performing only a representative duty. We held, however, that testimony of that sort may not be divorced from the person who speaks it. The questions the Government wished to ask would have required Curcio to disclose his own knowledge, and as a matter of law his responses could not be alienated from him and attributed to the labor union. In similar fashion, the act demanded of Braswell requires a personal disclosure of individual knowledge, a fact which cannot be dismissed by labeling him a mere agent.

The heart of the matter, as everyone knows, is that the Government does not see Braswell as a mere agent at all; and the majority's theory is difficult to square with what will often be the Government's actual practice. The subpoena in this case was not directed to Worldwide Machinery Sales, Inc., or Worldwide Purchasing, Inc. It was directed to "Randy Braswell, President[,] Worldwide Machinery Sales, Inc.[,] Worldwide Purchasing, Inc." and informed him that "[y]ou are hereby commanded" to provide the specified documents. App. 6. The Government explained at oral argument that it often chooses to designate an individual recipient, rather than the corporation generally, when it serves a subpoena because "[we] want the right to make that individual comply with the subpoena." Tr. of Oral Arg. 43. This is not the language of agency. By issuing a subpoena which

the Government insists is "directed to petitioner personally," Brief for United States 6 (filed Aug. 14, 1987), it has forfeited any claim that it is simply making a demand on a corporation that, in turn, will have to find a physical agent to perform its duty. What the Government seeks instead is the right to choose any corporate agent as a target of its subpoena and compel that individual to disclose certain information by his own actions.

The majority gives the corporate agent fiction a weight it simply cannot bear. In a peculiar attempt to mitigate the force of its own holding, it impinges upon its own analysis by concluding that, while the Government may compel a named individual to produce records, in any later proceeding against the person it cannot divulge that he performed the act. But if that is so, it is because the Fifth Amendment protects the person without regard to his status as a corporate employee; and once this be admitted, the necessary support for the majority's case has collapsed.

Perhaps the Court makes this concession out of some vague sense of fairness, but the source of its authority to do so remains unexplained. It cannot rest on the Fifth Amendment, for the privilege against self-incrimination does not permit balancing the convenience of the Government against the rights of a witness, and the majority has in any case determined that the Fifth Amendment is inapplicable. If Braswell by his actions reveals information about his state of mind that is relevant to a jury in a criminal proceeding, there are no grounds of which I am aware for declaring the information inadmissible, unless it be the Fifth Amendment.

In *Doe I* we declined expressly to do what the Court does today. Noting that there might well be testimonial assertions attendant upon the production of documents, we rejected the argument that compelled production necessarily carried with it a grant of constructive immunity. We held that immunity may be granted only by appropriate statutory proceedings. The Government must make a formal request

for statutory use immunity under 18 U. S. C. §§ 6002, 6003 if it seeks access to records in exchange for its agreement not to use testimonial acts against the individual. 465 U. S., at 614–617. Rather than beginning the practice of establishing new judicially created evidentiary rules, conferring upon individuals some partial use immunity to avoid results the Court finds constitutionally intolerable, I submit our precedents require the Government to use the only mechanism yet sanctioned for compelling testimony that is privileged: a request for immunity as provided by statute.

## II

The majority's abiding concern is that if a corporate officer who is the target of a subpoena is allowed to assert the privilege, it will impede the Government's power to investigate corporations, unions, and partnerships, to uncover and prosecute white-collar crimes, and otherwise to enforce its visitatorial powers. There are at least two answers to this. The first, and most fundamental, is that the text of the Fifth Amendment does not authorize exceptions premised on such rationales. Second, even if it were proper to invent such exceptions, the dangers prophesied by the majority are overstated.

Recognition of the right to assert a privilege does not mean it will exist in many cases. In many instances, the production of documents may implicate no testimonial assertions at all. In *Fisher*, for example, we held that the specific acts required by the subpoena before us "would not itself involve testimonial self-incrimination" because, in that case, "the existence and location of the papers [were] a foregone conclusion and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." 425 U. S., at 411. Whether a particular act is testimonial and self-incriminating is largely a factual issue to be decided in each case. *Doe II, post,* p. 201. In the case before us, the Government has made its submission

on the assumption that the subpoena would result in incriminating testimony. The existence of a privilege in future cases, however, is not an automatic result.

Further, to the extent testimonial assertions are being compelled, use immunity can be granted without impeding the investigation. Where the privilege is applicable, immunity will be needed for only one individual, and solely with respect to evidence derived from the act of production itself. The Government would not be denied access to the records it seeks, it would be free to use the contents of the records against everyone, and it would be free to use any testimonial act implicit in production against all but the custodian it selects. In appropriate cases the Government will be able to establish authenticity, possession, and control by means other than compelling assertions about them from a suspect.

In one sense the case before us may not be a particularly sympathetic one. Braswell was the sole stockholder of the corporation and ran it himself. Perhaps that is why the Court suggests he waived his Fifth Amendment self-incrimination rights by using the corporate form. One does not always, however, have the choice of his or her employer, much less the choice of the business enterprise through which the employer conducts its business. Though the Court here hints at a waiver, nothing in Fifth Amendment jurisprudence indicates that the acceptance of employment should be deemed a waiver of a specific protection that is as basic a part of our constitutional heritage as is the privilege against self-incrimination.

The law is not captive to its own fictions. Yet, in the matter before us the Court employs the fiction that personal incrimination of the employee is neither sought by the Government nor cognizable by the law. That is a regrettable holding, for the conclusion is factually unsound, unnecessary for legitimate regulation, and a violation of the Self-Incrimination Clause of the Fifth Amendment of the Constitution. For these reasons, I dissent.