## In re THREE GRAND JURY SUBPOENAS DUCES TECUM DATED JANUARY 29, 1999

United States of America, Appellant,

v.

**John Doe # 1, John Doe # 2, John Doe # 3, Appellees.**

**Docket No. 99–1143**

United States Court of Appeals, Second Circuit.

Argued: July 12, 1999.

Decided: Sept. 7, 1999.

**174**

Andrea Likwornik Weiss, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, Alex Young K. Oh, Ira M. Feinberg, Assistant United States Attorneys, New York, NY, on the brief), for Appellant.

Jerome Gotkin, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA (Joseph F. Savage, Jr., Testa, Hurwitz & Thibeault, LLP., Boston, MA, on the brief), for Appellee John Doe I.

Richard D. Weinberg, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York, N.Y. (Anirudh Bansal, New York, NY, on the brief), for Appellee John Doe II.

Joel Cohen, Stroock & Stroock & Lavan, New York, N.Y. (Michele L. Pahmer, New York, NY, on the brief), for Appellee John Doe III.

Before: WINTER, Chief Judge, WALKER, and CABRANES, Circuit Judges.

WALKER, Circuit Judge:

This case presents the question of whether an ex-employee of a corporation may assert a Fifth Amendment privilege to refuse to respond to a grand jury subpoena demanding that he produce documents belonging to his former employer on the ground that the act of producing the documents would be both testimonial and incriminating. Because we conclude that a Fifth Amendment privilege is available to the ex-employee in such circumstances, we affirm the order of the district court denying the government's motion to compel production pursuant to the subpoenas in this case.

## BACKGROUND

The essential facts in this appeal are undisputed. The subpoenas the government seeks to enforce were issued by a grand jury in the Southern District of New York in connection with the government's criminal investigation of a corporation and its employees. The alleged wrongdoing, which included falsification of the corporation's books and records and the misapplication of funds in the corporation's custody, occurred between 1993 and 1996 in one division of the corporation. In the spring of 1999, the corporation pled guilty to making false entries in its books and records, and, pursuant to a plea agreement, agreed to cooperate in the government's ongoing investigation of a number of individuals who may have been involved in the improper corporate activities.

Doe I, Doe II and Doe III were all officers of the corporation during the period in which the illegal activities occurred, and worked in the division where the

wrongdoing took place. Before the subpoenas sought to be enforced were issued, the employees resigned from the corporation or their employment was terminated.

## I. The 1996 Subpoenas

In June, September and October of 1996, the grand jury issued subpoenas to the corporation for records related to the investigation. The June subpoena, which was limited in scope, was not included in the record on appeal and was not presented to the district court. The government moved in this court to supplement the record to include the June subpoena, as well as two severance agreements between the corporation and Doe II and Doe III on the ground that such documents are material to the issues raised in this appeal. For completeness of the record, we grant the motion.[1] The September subpoena was broad in scope, covering virtually all of the conduct ultimately investigated; the October subpoena supplemented the September subpoena, calling for the production of two specific documentary items.

Doe I and Doe II were corporate officers when all three subpoenas were served on the corporation and during the time in which the corporation responded to the subpoenas. In fact, an affidavit filed by the corporation's counsel suggests that an attorney for the corporation met with Does I and II separately and asked them to produce responsive documents. Both Doe I and Doe II produced some responsive documents, but are alleged to have retained others. Doe I and Doe II left the corporation's employment in March and July of 1997, respectively. When Doe II resigned, he signed a severance agreement in which he agreed to cooperate with the corporation in any investigation to follow.

Doe III resigned from the company in mid-July, 1996, after the June subpoena was issued and served. The corporation's attorney attempted to contact Doe III to inquire whether she had responsive documents, but was unable to do so. The record is silent, however, on whether Doe III was aware of the June subpoena during the time she was still employed at the company. In any event, the government does not rely on Doe III's awareness of the June 1996 subpoena in its arguments on appeal. Upon her departure, Doe III also entered into a severance agreement with the corporation, dated July 16, 1996, in which she too agreed to cooperate with any investigation that followed.

## II. The January 1999 Subpoenas

Upon learning in January 1999 that a former company employee, not a party to these proceedings, had in her possession incriminating corporate records that were responsive to the 1996 subpoenas, but which had not been produced by the corporation, the government served grand jury subpoenas on twelve former employees—including Does I, II and III—whom the government believed maintained relevant records during their employment. The subpoenas each demanded "[a]ny and all records, documents, instructions, memoranda, notes and papers (whether in computerized or other form) in your care, custody, possession or control, that were created during the course of, or in connection with, your employment at [the corporation]."

Nine of the twelve former employees produced responsive documents. Doe I, Doe II and Doe III, however, declined to produce such documents, and asserted a Fifth Amendment privilege against their production. Doe II, alone, admitted to possessing responsive documents.[2]

---

**1.** We ultimately disagree, however, with the government's and the dissent's contention that these documents bear upon our resolution of the issue before us. *See* Part III *infra.*

**2.** Doe II also represented in a letter to the government that certain of the subpoenaed documents were exempted from disclosure under attorney-client and/or work product immunity, and that others were personal, and not corporate documents. Because we ultimately conclude that Doe II has a valid Fifth Amendment privilege claim, we do not reach

III. *Proceedings in the District Court*

On February 19, 1999, the government moved in Part I of the District Court to compel Doe I, Doe II and Doe III to produce documents demanded by the January 29, 1999 subpoenas. The motion, filed under seal, argued that the responsive documents were corporate documents and that Doe I, Doe II and Doe III remained corporate custodians of those documents after they left the corporation. Accordingly, the government contended, the former officers' claim of Fifth Amendment privilege was precluded by *Braswell v. United States*, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988), in which the Supreme Court, in an opinion authored by the Chief Justice, rejected a Fifth Amendment act of production privilege claim by a current employee and held that "the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege." *Braswell*, 487 U.S. at 110, 108 S.Ct. 2284.

All three appellees opposed the motion, not on the ground that the Fifth Amendment protected the *contents* of the subpoenaed documents, but rather on the ground that they had a Fifth Amendment right not to produce the documents because that *act of production* itself was (1) compelled, (2) testimonial, and (3) incriminating, in that compliance was the equivalent of forced testimony as to the existence, unlawful possession, and/or authenticity of the documents, as well as a belief that the produced documents matched those requested by the subpoena. *See Fisher v. United States*, 425 U.S. 391, 410, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

After full briefing and oral argument, Judge Sprizzo denied the government's motion to compel in a ruling issued from the bench. The district court relied on our pre-*Braswell* decision, *In re Grand Jury*

Doe II's alternative proposed grounds for

*Subpoenas Duces Tecum Dated June 13, 1983 and June 22, 1983,* 722 F.2d 981, 986–87 (2d Cir.1983) [hereinafter] (*"Saxon Industries"*), and the Fifth Amendment act of production doctrine established by the Supreme Court in cases such as *Fisher* and *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), to hold that "the act of testimonial [production] on behalf of a person who is no longer with the corporation is self-incrimination in its classic sense of the word, and the Constitution does not permit it." Judge Sprizzo stated further that the "question of testimonial incrimination is at its height when [the document] is produced by a person who is no longer employed by the corporation, because there is an inference that [he] may have stolen [it]." He noted that his holding was "predicated not only upon *Saxon,* but upon what I would do if *Saxon* were not even on the books.... *Saxon* just happens to hold the same way, but in fact if *Saxon* were not on the books, I would have reached the same conclusion."

## DISCUSSION

On appeal, the government contends that the district court erred in refusing to apply *Braswell* to reject a Fifth Amendment act of production privilege claim by former employees holding corporate documents. For the reasons that follow, we disagree. Some legal background is needed.

The Fifth Amendment provides, "No person ... shall be compelled in any criminal case to be a witness against himself." Beginning with the case of *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and continuing until the Supreme Court's decisions in *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), and *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), this right against self-incrimination was construed:

non-disclosure.

to protect an individual from compulsory production of all of his personal records that might tend to incriminate him. The rationale ha[d] been that a person's papers represent his personal communications and that without such protection he could be subjected to coercion designed to extract the evidence from him in the same manner as if he were forced to testify against himself.

*Saxon Industries,* 722 F.2d at 983 (citing *Couch v. United States,* 409 U.S. 322, 327–28, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973)).

Thus, under the now-discredited *Boyd* and its progeny, the Fifth Amendment inquiry centered on the nature and content of the subpoenaed documents: if papers were deemed private and were in the personal possession of the person claiming the privilege, the papers were protected, *see Couch,* 409 U.S. at 330–31 & nn. 10, 12, 93 S.Ct. 611; if, on the other hand, the papers were the records of an organization or "collective entity," no Fifth Amendment privilege attached, *see, .e.g., Wilson v. United States,* 221 U.S. 361, 374–75, 31 S.Ct. 538, 55 L.Ed. 771 (1911) (corporation); *United States v. White,* 322 U.S. 694, 701–04, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944) (labor union); *Bellis v. United States,* 417 U.S. 85, 93–101, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974) (law partnership). It was in this context that the Court's "collective entity doctrine" was established.

In *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), the Supreme Court rejected the argument that a corporate officer served with a subpoena for corporate documents (but personally immunized) could assert a Fifth Amendment privilege on behalf of the corporation. The Court held that a corporation was "a creature of the state" with powers limited by the state, and, thus, that the state could, in its oversight of the corporation, demand production of corporate documents. *Id.* at 74–75, 26 S.Ct. 370. *Hale* thus "carved an exception out of *Boyd* by establishing that corporate books and rec-

ords are not 'private papers' protected by the Fifth Amendment." *Braswell,* 487 U.S. at 105, 108 S.Ct. 2284.

Later, in *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), the Court held that a corporate president could not refuse to produce corporate records on the grounds that the books were personally incriminating. The Court stated:

> [Wilson] held the corporate books subject to the corporate duty. If the corporation were guilty of misconduct, he could not withhold its books to save it; and if he were implicated in the violations of the law, he could not withhold the books to protect himself from the effect of their disclosures. The [State's] reserved power of visitation would seriously be embarrassed if not wholly defeated in its effective exercise, if guilty officers could refuse inspection of the records and papers of the corporation. No personal privilege to which they are entitled requires such a conclusion.... [T]he visitatorial power which exists with respect to the corporation of necessity reaches the corporate books without regard to the conduct of the custodian....
>
> When [Wilson] became president of the corporation and as such held and used its books for the transaction of its business committed to his charge, he was at all times subject to its direction, and the books continuously remained under its control. *If another took his place, his custody would yield.* He could assert no personal right to retain the corporate books against any demand of government which the corporation was bound to recognize.

*Id.* at 384–85, 31 S.Ct. 538 (emphasis added); *see also Dreier v. United States,* 221 U.S. 394, 400, 31 S.Ct. 550, 55 L.Ed. 784 (1911) (applying *Wilson* where subpoena was addressed to the corporate custodian).

Later, the Court expanded the reach of the collective entity doctrine beyond the

corporate circumstances presented in *Hale* and *Wilson*, by holding that entities such as labor unions, *see White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, and partnerships, *see Bellis*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678, were bound by the collective entity rule. In doing so, "the Court jettisoned reliance on the visitatorial powers of the State over corporations owing their existence to the State—one of the bases for earlier decisions." *Braswell*, 487 U.S. at 108, 108 S.Ct. 2284. Instead, the Court relied on the fact that the individual subpoenaed held the collective entity's records in " 'a representative capacity,' " rendering " 'his personal privilege against compulsory self-incrimination ... inapplicable.' " *Id.* (quoting *Bellis*, 417 U.S. at 101, 94 S.Ct. 2179).

█ It was against this backdrop that the Supreme Court held in 1976 in *Fisher v. United States*, 425 U.S. at 405–09, 96 S.Ct. 1569, and in 1984 in *United States v. Doe*, 465 U.S. at 610–12, 104 S.Ct. 1237, that the "foundations for the [*Boyd* ] rule have been washed away," *Fisher*, 425 U.S. at 409, 96 S.Ct. 1569, and that the contents of voluntarily-prepared records are not protected by the Fifth Amendment against compelled production, *see Doe*, 465 U.S. at 610–12, 104 S.Ct. 1237. However, in *Fisher*, the Court recognized that a person, in the act of producing a document, may communicate information apart from its contents, and that the communication may amount to compelled testimony:

> The act of producing evidence in response to a subpoena ... has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [person subpoenaed]. It would also indicate the [person]'s belief that the papers are those described in the subpoena. *Curcio v. United States*, 354 U.S. 118, 125, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957).

*Fisher*, 425 U.S. at 410, 96 S.Ct. 1569; *see also Doe*, 465 U.S. at 612, 104 S.Ct. 1237 ("A government subpoena [for documents] compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect."). Accordingly, it is now settled that an individual may claim an act of production privilege to decline to produce documents, the contents of which are not privileged, where the act of production is, itself, (1) compelled, (2) testimonial, and (3) incriminating. *See Doe*, 465 U.S. at 612–14, 104 S.Ct. 1237. In *Doe*, the Court upheld an act of production privilege claim upon the district court's factual finding that production of the documents in question would be both testimonial and self-incriminating. *See id.* at 613–14, 104 S.Ct. 1237.

*United States v. Braswell*

In *Braswell*, the Court addressed the question of whether a current corporate employee could claim a Fifth Amendment act of production privilege to refuse to produce corporate documents. The Court held that the employee—an officer of two closely-held corporations—who had been individually subpoenaed to produce corporate books and records, could not invoke the Fifth Amendment to refuse production even though the documents might provide the government with evidence that could incriminate him. *See Braswell*, 487 U.S. at 109–10, 108 S.Ct. 2284. The Court stated:

> [T]he custodian of corporate or entity records holds those documents in a representative rather than a personal capacity. Artificial entities such as corporations may act only through their agents, and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government. Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the

corporation—which of course possesses no such privilege.

*Id.* (citation omitted). In short, the Court applied the collective entity doctrine, introduced by *Hale* and developed in *Wilson* and its progeny, to preclude the claim of an act of production privilege by a current corporate employee. In doing so, the Court employed something of a fiction—to wit, that a corporate employee acts *only* as an agent or custodian of the corporation when he produces corporate documents in response to a subpoena, even a subpoena directed to the employee personally. *See Braswell,* 487 U.S. at 126–28, 108 S.Ct. 2284 (Kennedy, J., dissenting).

While a current employee is not entitled to raise the Fifth Amendment as a shield against producing corporate documents under the rule set forth in *Braswell,* the *Braswell* Court created a mitigating evidentiary privilege to reduce the risk that the individual will incriminate himself in the course of producing such documents. The Court stated that:

> Although a corporate custodian is not entitled to resist a subpoena on the ground that his act of production will be personally incriminating, we do think certain consequences flow from the fact that the custodian's act of production is one in his representative rather than personal capacity. Because the custodian acts as a representative, the act is deemed one of the corporation and not the individual. Therefore, the Government concedes, as it must, that it may make no evidentiary use of the "individual act" against the individual. For example, in a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by one particular individual, the custodian. The Government has the right, however, to use the corporation's act of production against the custodian. The Government may offer testimony—for example, from the process server who delivered the subpoena and from the individual who received the records—establishing that the corporation produced the records subpoenaed.

*Id.* at 117–18, 108 S.Ct. 2284.

We have since had occasion to apply *Braswell* to deny to a current employee of a collective entity a Fifth Amendment privilege to decline to produce documents. In *In re Grand Jury Subpoenas Dated October 22, 1991, and November 1, 1991,* 959 F.2d 1158, 1163 (2d Cir.1992), following *Braswell,* we held that "the custodian of corporate records has no Fifth Amendment privilege to refuse to produce those records on the ground that the act of production itself would tend to incriminate him." *See also New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1356 (2d Cir.1989).

*Applicability of Braswell in Context of Former Employees*

 The question presented by this appeal, however, is different from that presented in *Braswell.* It is whether *former* employees of a corporation, who have corporate documents in their possession, may claim an act of production privilege notwithstanding *Braswell.* To hold, as the government suggests, that *Braswell* governs this appeal would require an extension of *Braswell* to the former employee based upon a conception that the former corporate employee who has corporate records holds them solely in a representative capacity, and acts as the corporation's agent when he or she produces them, even though the employment relationship has ended. Such a holding would also require us to overrule our decision in *Saxon Industries,* which is otherwise on point.

*Saxon Industries,* 722 F.2d 981 (2d Cir. 1983), involved an appeal by a former corporate officer who was held in civil contempt for his refusal to comply with a grand jury subpoena duces tecum commanding production of corporate records retained by him after he left the corporation. Though decided before *Braswell,* the

*Saxon Industries* panel anticipated its holding, stating that "if the witness were still a [corporate] officer or employee he would normally be obligated as a representative of the company to produce its documents, regardless of whether they contained information incriminating him." *Id.* at 986. We held, however, that "[o]nce the officer leaves the company's employ, ... he no longer acts as a corporate representative but functions in an individual capacity in his possession of corporate records." *Id.* at 986–87. Thus, in *Saxon Industries,* we remanded the case to the district court to determine "whether appellant's production of the [corporate] documents, regardless of their contents, might have [a] self-incriminatory effect." *Id.* at 987. We further noted that should the district court determine that the production would prove incriminatory, "the government could either by stipulation or by obtaining a grant of immunity pursuant to 18 U.S.C. §§ 6002–6003, immunize the act of production; such immunity would preserve the appellant's Fifth Amendment rights with respect to his conduct in producing the documents, *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)." *Id.* at 988.

The government and the dissent attempt to distinguish *Saxon Industries,* by noting that, in this case, unlike in *Saxon Industries,* (1) the documents were originally commanded via subpoenas directed at the corporation at a time, in 1996, when Does I, II and III were still employed by the corporation,[3] and (2) Doe II and Doe III signed severance agreements with the former employer which obligated them to cooperate in any ongoing investigations. We do not agree that these facts provide a basis for distinguishing *Saxon Industries.*

■ As to the first contention, we fail to see how the service of subpoenas on the corporation in 1996, even assuming that the Doe employees knew of the subpoenas, converted all three Does into corporate custodians for any corporate records they might possess after they left the corporation and for an indefinite period into the future. As to the second contention, neither the government nor the dissent has presented any authority for the proposition that a severance contract can create anything other than contractual duties between an employee and his or her former employer. Such a contract would not affect otherwise applicable Fifth Amendment rights, absent some form of voluntary and express waiver of such rights not present here. While the severance agreements required Doe II and Doe III to cooperate with the corporation in connection with any future investigations, the agreements do not include a waiver of Fifth Amendment rights. We do not agree with the dissent's assertion that, "[i]n light of the agreements, ... it is fair to argue that the former employees continued to 'act[ ] as corporate representative[s],' *Saxon Industries,* 722 F.2d at 986–87, at least for the limited purposes of holding any responsive documents...." *See infra* at 182. There is simply no basis in law for interpreting the severance agreements as giving rise to a continuing agency relationship between the former employees and their former employer. Thus, we are unable to find a principled reason to distinguish *Saxon Industries* from this case.

Alternatively, the government suggests that *Saxon Industries* does not survive *Braswell.* The government asserts that *Braswell*'s reasoning is equally applicable in the context of a former employee, because: (1) simply stated, *Braswell* stands for the principle that the collective entity doctrine overcomes the act of production principle whenever the documents subpoenaed are corporate documents; (2) *Braswell*'s reliance on cases such as *Bellis* and *Wheeler v. United States,* 226 U.S. 478, 489–90, 33 S.Ct. 158, 57 L.Ed. 309 (1913) suggests that *Braswell*'s holding extends

---

**3.** Doe III, however, was only employed at the corporation when the June 1996 subpoena was served, and the record is disputed as to whether Doe III was aware of the subpoena.

to former employees; and (3) *Braswell*, by creating the evidentiary privilege discussed above, resolved the problem that concerned us in *Saxon Industries* regarding how to protect a former employee against the personal consequences of producing corporate documents when his act might prove personally incriminating.

We disagree that *Braswell* affects our holding in *Saxon Industries* and hold that the latter remains good law. The rule in *Braswell* was predicated on the rationale that corporate custodians hold and produce documents only in a representational capacity and that when a corporate custodian produces subpoenaed corporate records, at bottom, "the corporation produce[s] the documents subpoenaed." *Braswell*, 487 U.S. at 118, 108 S.Ct. 2284. It follows, as we noted in *Saxon Industries*, that once the agency relationship terminates, the former employee is no longer an agent of the corporation and is not a custodian of the corporate records. When such an individual produces records in his possession he cannot be acting in anything other than his personal capacity. In no sense can it be said, as *Braswell* requires, that "the corporation produced the records subpoenaed." Nothing in *Braswell* convinces us otherwise, and neither the government nor the dissent has directed us to any authority for the proposition that the agency relationship between an employee and an employer somehow continues after the employment relationship ends.

Indeed, this is the crux of our difference with the dissent. In the absence of legal authority to the effect that a former employee remains an agent of the corporation, or any evidence that the corporation and the individual intended to maintain an agency relationship, the foundation upon which *Braswell* rests—that one who is currently employed by the corporation holds documents as an agent in a custodial capacity so that it is actually the corporation that is producing the records—is removed.

The government's reliance on *Bellis* and *Wheeler* is wholly misplaced. In *Bellis*, the Supreme Court held that a law partner of a dissolved partnership could not assert a Fifth Amendment privilege with respect to the *contents* of certain partnership records, since the partner held the records in a representational capacity. There, the Court recognized that the subpoenaed partner, unlike appellees in this case, was still an agent of the dissolved partnership, since the "dissolution of the partnership does not terminate the entity; rather it continues until the winding up of the partnership affairs is completed." *Bellis*, 417 U.S. at 96 n. 3, 94 S.Ct. 2179. The *Braswell* Court's citation to *Bellis* is not relevant to the issue presented by this appeal.

The Supreme Court's decision in *Wheeler* is also inapposite because the critical question in that case was not whether a former employee could still act in a representative capacity on the corporation's behalf—a subject not even touched upon in the opinion—but simply whether the documents were personal or corporate in nature, the answer to which does not depend upon the employment status of the document holder. The Court held that the principal officers of a dissolved corporation, who had never resigned as officers, had no Fifth Amendment privilege with respect to the *contents* of the corporation's books and records. *See Wheeler*, 226 U.S. at 489–490, 33 S.Ct. 158. The Court held that the case was "virtually ruled by *Wilson v. United States*," *id.* at 489, 33 S.Ct. 158, and that the corporate character of the books and records did not change by virtue of the fact that the corporation had been dissolved prior to the issuance of the subpoena, *see id.* at 489–90, 33 S.Ct. 158. While the former officers in *Wheeler* were no longer agents of the dissolved corporation, *Wheeler* cannot stand for the proposition that the collective entity doctrine "applies not only to current agents of the entity but also to *former* agents," as the dissent asserts. *See infra* at 184. *Wheeler* was decided before the Court "jettisoned reliance on the visitatorial powers of the

State over corporations," *Braswell,* 487 U.S. at 108, 108 S.Ct. 2284, as a basis for denying assertions of the privilege. Under the now-discarded rationale of cases such as *Wilson* and *Wheeler,* the fact that an individual was or was not an agent of the corporation was simply beside the point to the then-relevant inquiry into whether the records subpoenaed were personal or corporate in character. Accordingly, we do not believe that *Wheeler* is supportive of the dissent's position.

We also reject the notion advanced by the government that the creation of the evidentiary privilege by the *Braswell* Court somehow affects the analysis of the scope of appellees' Fifth Amendment rights. It appears to us that the Court crafted the evidentiary privilege in *Braswell* to ameliorate the effect on the custodian in his individual capacity when, as an agent, he was the vehicle through whom "the corporation produced the documents subpoenaed." *Braswell,* 487 U.S. at 118, 108 S.Ct. 2284. Even were we to assume that the evidentiary privilege set forth in *Braswell* would protect appellees if the dissent's position were the law, there remains the question of whether the different Fifth Amendment privilege is available to former employees as to whom the act of production would amount to compulsory, testimonial self-incrimination. As the government itself recognizes, the evidentiary privilege created by the Supreme Court in *Braswell* is not co-extensive with a Fifth Amendment privilege. The *Braswell* privilege would have to be asserted by the person subpoenaed and would not extend to evidence derived from that production; whereas if the government chooses to confer act of production immunity on Does I, II and III, as it may do pursuant to 18 U.S.C. §§ 6002, 6003,

[t]estimony obtained pursuant to a grant of statutory use immunity may be used neither directly or derivatively. 18 U.S.C. § 6002; *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). And "[o]ne raising a claim under [the federal immunity] statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."

*Braswell,* 487 U.S. at 117, 108 S.Ct. 2284 (quoting *Kastigar,* 406 U.S. at 461–62, 92 S.Ct. 1653) (alterations in original).

Nor are we dissuaded from our adherence to *Saxon Industries* by the government's contention that our continued reliance would "create[ ] a perverse incentive for an employee to leave the corporation with the documents in his custody rather than comply with his legal obligation to produce the documents," and would thereby undermine effective law enforcement. First, we believe the government overstates its case in this regard. *Saxon Industries* has been the law of this circuit since 1983, and *Braswell* was decided in 1988. The incentives have been in place for over a decade, with few reported incidents of employees stealing corporate documents and leaving a company's employ before or shortly after being served with a subpoena to produce such documents.[4] Any such additional criminal behavior is fully sanctionable in an independent prosecution for theft or obstruction of justice and, upon conviction for any underlying federal crime, by enhanced penalties for obstruction of justice under federal sentencing guidelines. *See* U.S. Sentencing Guidelines Manual § 3C1.1. Moreover, the corporation has an independent right to

4. If the employee is subpoenaed personally for corporate documents while employed at the company, *Braswell,* of course, holds that the employee may not claim an act of production privilege. If the subpoenaed employee subsequently terminates his or her employment, seeking protection under *Saxon Industries,* the employee presumably could be found in contempt of court for refusing to comply with the subpoena served while he or she was still employed by the corporation and a custodian without Fifth Amendment protection.

recover any of its missing documents in a replevin action and indeed, where it has agreed to cooperate with the government as in this case, it probably has a duty to do so. Finally, there is nothing in the Fifth Amendment that prevents the government from proceeding to recover the documents itself, without compelling their production by the person in possession, by means of a search warrant.

In any event, it is inherent in the Fifth Amendment's privilege against self-incrimination that a greater burden is placed on law enforcement than would otherwise be the case. If our determination of the Fifth Amendment's reach turned on the policy considerations of the sort advanced by the government, the basic protection against self-incrimination that the Founders prescribed in the Fifth Amendment would be substantially undermined. It is inescapable that, because the privilege protects against self-incrimination, the greater and more varied the criminal conduct, the wider the application of the privilege. For example, in this case the individuals asserting the privilege are likely concerned about being compelled to incriminate themselves not only with respect to the original investigation but also with respect to the subsequent theft of, or failure to return, corporate documents and any resulting obstruction of justice. These added crimes, as Judge Sprizzo noted, provide added justification for applying the privilege.

The Supreme Court stated long ago that "the basic purposes that lie behind the privilege against self-incrimination do not relate to protecting the innocent from conviction, but rather to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution shoulder the entire load." *Teham v. United States ex rel. Shott,* 382 U.S. 406, 415, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966) (internal quotation marks omitted). Our recognition of the act of production privilege on the facts presented in this case comports with these purposes.

Other circuits have split on this issue. Two circuit courts have recognized *Braswell*'s inapplicability to former employees. The Third Circuit, in *United States v. McLaughlin,* 126 F.3d 130, 133 n. 2 (3d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2366, 141 L.Ed.2d 735 (1998), stated in dicta that "a former employee, for example, who produces purloined corporate documents is obviously not within the scope of the *Braswell* rule." And the Ninth Circuit in *In re Grand Jury Proceedings,* 71 F.3d 723, 724 (9th Cir.1995), followed *Saxon Industries* and held "that the collective entity rule ... does not apply to a former employee of a collective entity who is no longer acting on behalf of [the] collective entity." Two other circuits have held that *Braswell* does apply in such cases. *See In re Grand Jury Subpoena Dated November 12, 1991,* 957 F.2d 807, 810–13 (11th Cir.1992) (rejecting the analysis of *Saxon Industries,* and holding that it is the "immutable character of the records as corporate which requires their production and which dictates that they are held in a representative capacity"); *In re Sealed Case (Government Records),* 950 F.2d 736, 740 (D.C.Cir.1991) ("Just as corporate records belong to the corporation and are held for the entity by the custodian in an agency capacity, so government records do not belong to the custodian, in this case the [former employee], but to the government agency. Their production thus falls outside the Fifth Amendment Privilege.") (citation omitted). We are unpersuaded by the analysis in the latter two cases.

## CONCLUSION

For the reasons stated above, we hold that *Saxon Industries* remains good law and dictates the result in this case. Since Doe I, Doe II and Doe III are no longer employed by the corporation whose documents the government seeks, and therefore do not hold the corporate documents in a representational capacity, we conclude that each may claim a Fifth Amendment

act of production privilege with respect to the documents called for in the 1999 subpoenas.

Affirmed.

JOSÉ A. CABRANES, Circuit Judge, dissenting:

It has been settled for more than a decade that a custodian of corporate records may not "resist a subpoena for such records on the ground that the act of production would incriminate him in violation of the Fifth Amendment." *Braswell v. United States*, 487 U.S. 99, 100, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). Relying on our pre-*Braswell* decision in *In re Grand Jury Subpoenas Duces Tecum Dated June 13, 1983 and June 22, 1983*, 722 F.2d 981 (2d Cir.1983) ("*Saxon Industries*"), the majority today excepts from *Braswell*'s reach any former corporate agent who possesses corporate documents that he retained after leaving the corporation's employ. The majority does so despite the fact that all three of the former employees resisting the subpoenas in this case left the corporation *after* the corporation had been served with its subpoenas, and despite the fact that two of the former employees had signed severance agreements in which they accepted a continuing duty to assist the corporation in any investigation conducted by or involving the corporation.

The majority's exception to the rule of *Braswell* finds no support in Supreme Court precedent and it creates a powerful incentive for corporate employees and other agents to abscond with subpoenaed records in order to avoid judicial process. Accordingly, I dissent.

**I.**

As the majority opinion discusses at some length, a series of Supreme Court cases, beginning with *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), and *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), ruled that a person who holds documents in his capacity as an agent of a "collective entity"—such as a corporation or partnership—may not claim that the Fifth Amendment prohibits compulsory production of those documents. In *Wheeler v. United States*, 226 U.S. 478, 489–90, 33 S.Ct. 158, 57 L.Ed. 309 (1913), and *Grant v. United States*, 227 U.S. 74, 80, 33 S.Ct. 190, 57 L.Ed. 423 (1913), the Supreme Court made it clear that the "collective entity" doctrine applies not only to *current* agents of the entity, but also to *former* agents who have retained documents that they initially held in their capacity as custodian and agent.[1] The Court explained that "the privilege of individuals against self-incrimination in the production of their own books and papers" does not prevent "the compulsory production of the *books of a corporation with which they happen to be or have been associated.*" *Wheeler*, 226 U.S. at 490, 33 S.Ct. 158 (emphasis added). Despite the fact that the corporation in that case had already gone out of business and despite the fact that "the books of the company had before the dissolution been made over" to the subpoenaed custodians, "this did not change the essential character of the books and papers or make them any more privileged in the investigation of crime than they were before." *Id.*

These "collective entity" cases had all involved instances in which an agent or former agent sought to invoke the Fifth Amendment privilege against documents that purportedly *contained* incriminating

---

1. As the majority notes, *see ante* at 181, the Supreme Court also reached the same result in *Bellis v. United States*, 417 U.S. 85, 96 n. 3, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), but based its decision in part on particular features of partnership law that are not implicated in the instant case, in which the relevant collective entity is a corporation. Nothing in *Bellis*, however, casts doubt on the validity of the Supreme Court's earlier decisions dealing with former *corporate* agents. Indeed, the *Bellis* Court cited both *Wheeler* and *Grant* with apparent approval. *See id.*

information. For this reason, the scope of the "collective entity" rule was made uncertain for a time when the Supreme Court decided in *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), that an individual may assert an "act of production" privilege where the very act of producing the requested documents would tend to incriminate that individual. The facts in *Fisher* did not directly implicate the "collective entity" rule, as there was no suggestion that the documents at issue there were held by someone as a current or former agent of an entity. As a result, it was not immediately clear whether a custodian would be entitled, after *Fisher,* to invoke the "act of production" privilege to trump the "collective entity" rule. *Compare In re Grand Jury Proceedings,* 771 F.2d 143, 147–48 (6th Cir.1985) (en banc) (refusing to recognize an "act of production" privilege with respect to corporate documents), *with United States v. Antonio J. Sancetta, M.D., P.C.,* 788 F.2d 67, 74–75 (2d Cir.1986) (recognizing that a representative of a collective entity may assert that the "act of production" incriminates him and therefore is privileged).

In *Braswell,* the Supreme Court responded to this uncertainty by disagreeing with the proposition that *Fisher* "rendered the collective entity rule obsolete." *Braswell,* 487 U.S. at 109, 108 S.Ct. 2284. The Court noted that it could have been said in prior collective entity cases—where the subpoena had been directed to a custodian, demanding that he produce records in his custody—that "the custodian's act of producing the documents would 'tacitly admi[t] their existence and their location in the hands of their possessor.'" *Id.* at 111, 108 S.Ct. 2284 (quoting *Fisher,* 425 U.S. at

411–12, 96 S.Ct. 1569 (alteration in *Braswell*)). While the *Braswell* Court conceded that these earlier collective entity cases had not explicitly considered (à la *Fisher*) the testimonial consequences of the act of production itself, the Court stated that it did "not think such a focus would have affected the results reached." *Id.* The Court explained that the collective entity rule was extensive enough to override the "act of production" privilege because " '[i]t is well settled that *no* privilege can be claimed by the custodian of corporate records....'" *Id.* (quoting *Bellis v. United States,* 417 U.S. 85, 100, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974)) (emphasis added; ellipsis in *Braswell*).

The majority today insists on limiting *Braswell* to its facts by treating that decision as having established a rule that applies only to *current* agents of an entity. *See ante* at 179 stating that the Supreme Court in *Braswell* ("applied the collective entity doctrine, introduced by *Hale* and developed in *Wilson* and its progeny, to preclude the claim of an act of production privilege by a *current corporate employee* " (emphasis added)). But *Braswell* itself purports to apply the collective entity rule, in full, to assertions of the "act of production" privilege. *See* 487 U.S. at 109–10, 111, 108 S.Ct. 2284. And, as I have discussed above, the collective entity rule has long applied to current and former agents alike, continuing to treat corporate documents as such, even when they remain in the custody of an erstwhile corporate agent whose employment with the corporation has terminated. *See, e.g., Wheeler,* 226 U.S. at 490, 33 S.Ct. 158.[2]

I recognize that our pre-*Braswell* decision in *Saxon Industries* would have

---

**2.** The majority contends that *Wheeler* is inapposite because its holding was limited to whether there is a "Fifth Amendment privilege with respect to the *contents* of the corporation's books and records," and because the case was decided "before the Court 'jettisoned reliance on the visitatorial powers of the State over corporations.'" *Ante* at 181–82 (quoting *Braswell,* 487 U.S. at 108, 108 S.Ct. 2284). That *Wheeler* concerned only the

contents of a corporation's books and records, and not the act of producing them, however, is analogous to an argument made by the dissenters in *Braswell* with respect to the full line of collective entity cases. *See* 487 U.S. at 123–26, 108 S.Ct. 2284 (Kennedy, J., dissenting). Significantly, that argument was rejected by a majority of the Court. As for the contention that *Wheeler* 's rationale is no longer accepted, the Supreme Court cited the

drawn precisely the distinction embraced by the majority in this case, and thereby given former (but not current) agents the benefit of the "act of production" privilege. In my view, however, the distinction drawn in *Saxon Industries* runs contrary to the Supreme Court's rule in *Braswell.* Because we obviously must apply Supreme Court precedent, even when it conflicts with our own, earlier authority, I believe we are bound to recognize that *Saxon Industries* is no longer good law.

Even if I believed that *Saxon Industries* retained its vitality, I would disagree with the majority's refusal to distinguish it here. In the instant case, John Doe I, John Doe II, and John Doe III were all in the corporation's employ at the time the initial subpoena was served on the corporation. John Doe I and John Doe II were still employed by the corporation at the time it was served with two subsequent subpoenas, which were broader in scope.[3] By contrast, in *Saxon Industries*, it appears that the first subpoena issued in the case was the one issued to the witness-appellant, who had ceased to work for the corporation approximately *one year earlier. See Saxon Industries,* 722 F.2d at 982–83. Thus, unlike the instant case, there was little reason there to fear that the former agent had left the corporation's employ *specifically* to conceal evidence relating to an ongoing investigation.

Nor is there any indication from the *Saxon Industries* decision that the employee there had signed an agreement under which he assumed any post-employment obligations with respect to investigations. Significantly, in the instant case, John Doe II and John Doe III signed severance agreements requiring them to assist the corporation in any investigation. To be sure, as the majority observes, the severance agreements do not purport to waive the employees' Fifth Amendment rights. *See ante* at 180. In light of the agreements, however, it is fair to argue that the former employees continued to "act[ ] as corporate representative[s]," *Saxon Industries,* 722 F.2d at 986–87, at least for the limited purposes of holding any responsive documents—which are, concededly, corporate documents—and of assisting in the investigation. So characterized, they would not be entitled to assert the "act of production" privilege, even under *Saxon Industries.*[4]

## II.

Rather than recognizing our decision in *Saxon Industries* to have been overruled

case approvingly in *Bellis,* 417 U.S. at 88–89, 94 S.Ct. 2179, and cited it again in *Braswell,* 487 U.S. at 111 n. 4, 108 S.Ct. 2284, well *after* the Court "jettisoned reliance on the visitatorial powers of the State over corporations" as *"one* of the bases" for the collective entity rule. *Id.* at 108, 108 S.Ct. 2284 (emphasis added). In short, *Wheeler* stands for the proposition that, for the purposes of the collective entity rule, termination of a custodian's employment with a corporation does not terminate his custodianship of corporate documents that remain in his possession.

**3.** Moreover, it is clear that John Doe I and John Doe II were aware of the subpoenas. While John Doe I and John Doe II were still employed by the corporation, counsel for the corporation met with them separately, and asked for material responsive to the broadest of the three subpoenas. Each employee provided some responsive documents.

**4.** Responding to this point, the majority contends that "[t]here is simply no basis in law for interpreting the severance agreements as giving rise to a continuing agency relationship between the former employees and their former employer." *Ante* at 180. This reasoning bears striking resemblance to that of Justice Kennedy's dissent in *Braswell,* which chided the majority for allegedly misapplying common law principles of agency. *See Braswell,* 487 U.S. at 126–28, 108 S.Ct. 2284 (Kennedy, J., dissenting). The crucial issue for Fifth Amendment purposes, however, is not whether an individual continues to act as an agent of a corporation for all purposes even after terminating his employment, but whether that individual acts in a "representative capacity" when he holds, and produces, concededly corporate documents subject to subpoena. *See, e.g., In re Grand Jury Subpoena Dated November 12, 1991,* 792 F.Supp. 1423, 1427–30 (S.D.Fla.), *aff'd,* 957 F.2d 807 (11th Cir.1992). With respect to that question, I believe the severance agreements are legally significant.

by the Supreme Court, the majority opinion gives *Saxon Industries* an overly expansive reading. Not only does the majority make eligible for the "act of production" privilege—in the teeth of the *Braswell* rule—those former employees or agents who have retained corporate documents, but it extends this eligibility even to those agents who depart in the midst of an investigation and sign severance agreements pledging that they will cooperate with any investigation involving the corporation.

The majority apparently takes comfort from the fact that "*Saxon Industries* has been the law of this circuit since 1983, and *Braswell* was decided in 1988"; accordingly, the majority reassures us that "[t]he incentives [which are of concern to the Government] have been in place for over a decade, with few reported incidents of employees stealing corporate documents and leaving a company's employ before or shortly after being served with a subpoena to produce such documents." *Ante* at 182. But that should hardly come as a surprise. First of all, even if *Braswell*, which involved a current employee, did not explicitly overrule *Saxon Industries*, the Supreme Court case at least raised serious questions about whether our decision remained good law. *Cf. In re Grand Jury Subpoena Dated November 12, 1991*, 957 F.2d 807, 811–12 (11th Cir.1992) (declining to follow *Saxon Industries* in light of *Braswell* ); *Thomas v. Tyler*, 841 F.Supp. 1119, 1129 (D.Kan.1993) (same). Accordingly, one should not expect a reasonably prudent party to have relied on *Saxon Industries* during the period after 1988. Moreover, even *Saxon Industries* did not involve a fact pattern in which an employee left his employment with corporate documents in the midst of a federal grand jury investigation during which subpoenas had already been served on the corporation. To the contrary, as discussed above, the employee in *Saxon Industries* resigned a full year before any subpoena was issued. Only by imagining the unprecedented results of this very case—that is, by taking several large, uncertain steps beyond *Saxon Industries*—could parties or their counsel have believed that a former employee could invoke the "act of production" privilege after resigning and taking corporate documents in the midst of a criminal investigation of the corporation, despite a continuing contractual obligation to cooperate with any investigation.

The majority opinion here provides each of those large steps. In doing so, it creates "an obvious haven for those who seek to frustrate the legitimate demands for the production of relevant corporate records made by a grand jury." *In re Grand Jury Subpoena Dated November 12, 1991*, 957 F.2d at 810 (internal quotation marks omitted). The unintended consequences of the majority opinion are not difficult to imagine: A person who is well-informed on the state of the law, and whose activities within a "collective entity" are under investigation, hereafter will have a clear incentive to leave the organization, take with him—with or without the assistance of the organization—any documents that he knows may contain evidence of wrongdoing, and then resist production of these documents by asserting a claim of privilege against compelled self-incrimination. We should not be surprised if in the future, as a direct result of today's holding, we see more "reported incidents," *ante* at 182, of this sort of obstructionist behavior.

For all of the foregoing reasons, I respectfully dissent.