### In re KELLER FINANCIAL SERVICES OF FLORIDA, INC., Debtor.

Kevin O'Halloran, as Trustee for Keller Financial Services of Florida, Inc., Plaintiff/Counterdefendant,

v.

Joseph M. Williams, Trustee of the Keller Financial Services, Inc./Michael Nixon Trust; Keller Financial Services, Inc./Indemnity Obligations Trust; Keller Financial Services, Inc./Timothy Gillis Trust; Keller Financial Services, Inc./Brian Keller Trust, Defendant/Counter and Cross Plaintiff,

Morgan Stanley Dean Witter, Inc.; Michael F. Nixon; and Brian R. Keller, Defendants/Crossdefendants.

Bankruptcy Nos. 98–5299–8G1, 98–5361–8G1 to 98–5369–8G1. Adversary No. 99–28.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 18, 2000.

Mark J. Bernet, Sterns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Tampa, FL, for plaintiff, Kevin O'Halloran.

Kelli Hanley Crabb, Battaglia, Ross, Dicus & Wein, St. Petersburg, FL, for defendant/crossdefendant, Brian R. Keller.

Robert A. Soriano, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, for defendant/counter and cross plaintiff, Joseph M. Williams.

Theresa M. Boatner, U.S. Trustee, Tampa, FL.

## ORDER ON BRIAN R. KELLER'S MOTION FOR PROTECTIVE ORDER, AND ON PLAINTIFF'S MOTION TO COMPEL DISCOVERY OR ALTERNATIVELY TO STRIKE ANSWER AND AFFIRMATIVE DEFENSES OF BRIAN R. KELLER

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court for hearing to consider the Motion for Protective Order filed by the Defendant, Brian R. Keller, and also to consider the Motion to Compel Discovery or Alternatively to Strike Answer and Affirmative Defenses of Brian R. Keller filed by the Plaintiff, Kevin O'Halloran, as Trustee of Keller Financial Services of Florida, Inc.

The Motions relate to the Plaintiff's First Interrogatories to Brian R. Keller and to Plaintiff's First Request for Production of Documents and Things from Brian R. Keller. The Plaintiff served the discovery requests on the Defendant, Brian R. Keller (Keller) on June 30, 1999. Keller asserts that he has become aware of a pending criminal investigation in which he is or may be a target, and that he therefore declines to respond to the discovery requests on the basis of his privilege against self-incrimination guaranteed under the Fifth and Fourteenth Amendments.

### Background

The ten debtor corporations filed their petitions under chapter 11 of the Bankruptcy Code on April 1 and April 2, 1998. Generally, the Debtors had raised funds primarily from the sale of secured notes to investors, and used such funds in the subprime automobile lending industry.

After the filing of the bankruptcy petitions, Kevin O'Halloran was appointed as the Chapter 11 Trustee in the cases.

The Plaintiff, Kevin O'Halloran, as Trustee of Keller Financial Services of Florida, Inc., (the Plaintiff) commenced this adversary proceeding by filing a Complaint to recover certain funds transferred from the Debtors to various trusts.

The Plaintiff alleges that Michael Nixon is a former president of the Debtor, and that Brian Keller is a former director and person in control of the Debtor.

On February 28, 1997, five separate agreements were executed on behalf of

Keller Financial Services, Inc. and Keller Financial Services of Florida, Inc. as the "Grantor." Each of the agreements is entitled "Irrevocable Trust Agreement (Severance Benefits)." The beneficiaries of the agreements are Michael Nixon, Brian Keller, Timothy Gillis (Gillis), John Hallstrom (Hallstrom), and Greg Stiff (Stiff), respectively. Gillis, Hallstrom, and Stiff were employees of the Debtors. Each agreement provided that its purpose was to assure the availability of funds for the payment of severance benefits, including severance compensation, in the event that the named beneficiary's employment was terminated without reasonable cause, or in the event that the beneficiary voluntarily terminated the employment for good reason.

A sixth agreement was also executed on February 28, 1997, on behalf of Keller Financial Services, Inc. and Keller Financial Services of Florida, Inc. as grantors. The sixth agreement is entitled "Irrevocable Trust Agreement (Indemnity Obligations)." The beneficiaries of the sixth agreement are Gillis, Stiff, Hallstrom, Nixon, Keller, and two other individuals who provided services to the Debtors. The stated purpose of the sixth agreement was to assure the availability of funds to indemnify the beneficiaries for any costs incurred or losses or damages sustained as a result of claims arising from their services to the Debtors.

Joseph M. Williams is the Trustee under each Trust Agreement.

According to the Plaintiff, the Debtors transferred the sum of $90,000 to fund the "Nixon Trust," the sum of $54,000 to fund the "Brian Keller Trust," the sum of $75,000 to fund the "Gillis Trust," the sum of $47,500 to fund the "Hallstrom Trust," the sum of $60,000 to fund the "Stiff Trust," and the sum of $150,000 to fund the "Indemnification Trust."

The Plaintiff further alleges that the "Gillis Trust" was terminated in January of 1998, and that the full amount contained in the Trust was transferred to the "Keller Trust." Finally, the Plaintiff alleges that the sum of $138,060 was disbursed from the "Keller Trust" to Brian Keller in July of 1998.

The Plaintiff estimates that the "Indemnification Trust" currently contains approximately $164,000, that the "Nixon Trust" currently contains approximately $90,000, and that the "Keller Trust" and the "Hallstrom Trust" contain only nominal amounts.

The Complaint includes 14 counts. Count 1 is an action for turnover under § 542 and § 543 of the Bankruptcy Code. In Count 1, the Plaintiff requests the entry of an order requiring the turnover of the entire balance contained in the "Nixon Trust." In Counts 2 through 4, the Plaintiff seeks to avoid the transfers from the Debtors to the "Nixon Trust" pursuant to § 544 of the Bankruptcy Code and Florida's fraudulent transfer statutes. In Counts 5 through 7, the Plaintiff seeks to avoid the transfers from the Debtors to the "Indemnification Trust" pursuant to § 544 and Florida's fraudulent transfer statutes. In Counts 8 through 10, the Plaintiff seeks to avoid the transfers from the Debtors to the "Keller Trust" and Brian Keller pursuant to § 544 and Florida's fraudulent transfer statutes. In Counts 11 through 13, the Plaintiff seeks to avoid the transfers from the Debtors to the "Gillis Trust" and ultimately to Brian Keller pursuant to § 544 and Florida's fraudulent transfer statutes. In Count 14, the Plaintiff seeks an injunction prohibiting the transfer of the funds presently in the "Nixon Trust" and the "Indemnification Trust."

Brian Keller filed an Answer to the Complaint Generally, Keller denied the allegations of the Complaint that were directed to him, and asserted three affirmative defenses. First, Keller contends that the transfers were made for reasonably equivalent value. Second, Keller contends that the transfers were made in the ordinary course of business and, third, Keller

contends that the transfers were made in a good faith effort to rehabilitate the Debtors.

On June 30, 1999, the Plaintiff served his First Interrogatories to Brian R. Keller. In the Interrogatories, the Plaintiff asks Keller to furnish the following information:

1. The identity of the persons that he consulted in preparing his responses.

2–4. The facts, and persons with knowledge of the facts, concerning his three affirmative defenses.

5. The reasons he permitted the six Trusts to be created.

6. The reasons he asked Gillis to sign documents regarding the transfer of funds.

7–8. An identification of any communications with attorney Domenic Massari regarding the creation of the Trusts or Keller's personal liability.

9. The reasons he entered an employment agreement with the Debtors after July 1, 1996.

10. The reasons the Debtors stopped making dividend payments to their shareholders after the third quarter of 1996.

11. The amount received from the Keller Trust in July of 1998.

12–13. The reasons he was entitled to the funds in the Nixon Trust and the Gillis Trust.

14–16. The identity of the witnesses that he intends to call at trial, the documents that he used in answering the Interrogatories, and any expert witnesses that he may call or considered calling at trial.

On June 30, 1999, the Plaintiff also served on Keller his Request for Production of Documents and Things. In the Request, the Plaintiff asked Keller to produce documents or information concerning the following topics:

1. His responses to the Interrogatories.

2. The creation of the Trusts.

3–5. Communications between Keller, Keller Financial Services, Inc. (KFS), or Keller Financial Services of Florida, Inc. (KFS–Fla.) and attorney Domenic Massari regarding the Trusts.

6–8. Communications between Keller, KFS, or KFS–Fla. and the Trustee regarding the Trusts.

9–11. Communications between Keller, KFS, or KFS–Fla. and Carlton Fields regarding the Trusts.

12–14. Communications between Keller, KFS, or KFS–Fla. and Michael Williams regarding the Trusts.

15. Keller's efforts to transfer or obtain funds from the Trusts.

16–17. The employment of Keller, Gillis, Hallstrom, LaMar Watkins, Stiff, or Chuck Crouse with KFS of KFS–Fla.

18. Reasons for Keller's decision to permit the creation of the Trusts.

19–20. Keller's "reasonably equivalent value" or "ordinary course of business" affirmative defenses.

21–22. All documents identified in his witness or exhibit list, and all documents that he intends to use at trial.

23. The disposition of the funds received from the Keller Trust.

24. The solvency or financial condition of the Debtors as of the time of the transfers.

25. Keller's diaries or calendars regarding the Trusts.

Keller responded to the Interrogatories and Requests for Production in writing. With respect to each Interrogatory, Keller responded that he declined to answer the interrogatory propounded for the reason set forth in his General Response. In the General Response, Keller invoked his privilege against self-incrimination.

Keller subsequently filed a Supplemental Response to the Interrogatories which included a more detailed statement of his position. In the Supplement, Keller again invoked his privilege against self-incrimi-

nation, and asserted that he has learned of a pending criminal investigation in which he is or may be a target, and which may involve facts which form the basis of the Complaint that commenced this case. Keller asserts that his belief that his responses may incriminate him is well-grounded, and that the belief is predicated on four sources of information:

1. A search warrant was executed on the law offices and residence of Domenic Massari, the former attorney for the Debtors.

2. Keller's present attorney has received information from F.B.I. agents that Keller may be the target of an ongoing criminal investigation.

3. An Assistant United States Attorney advised Keller's current attorney that, in his opinion, Keller may be indicted on charges relating to bankruptcy fraud and also on charges relating to certain of the Debtors' prebankruptcy transactions.

4. F.B.I. agents and representatives of the United States Attorneys' Office have attended various evidentiary hearings in the Bankruptcy Court.

Additionally, Keller contends that he seeks no affirmative relief in this adversary proceeding, but intends only to defend the allegations against him. Consequently, Keller states that he is willing to furnish certain information requested by the Plaintiff, provided that the production is made only pursuant to the direction of the Court and pursuant to a ruling by the Court that the production will not constitute a waiver of Keller's privileges under the Fifth or Fourteenth Amendment, or any applicable work product or attorney-client privilege. Under these conditions, Keller states that he would provide, for example, the identity of the witnesses, documents, and facts which support his affirmative defenses.

Keller filed a separate Response to the Plaintiff's Request for Production of Documents, and declined to produce the requested items based on six General Objec-

tions: (1) Place and time of production; (2) Attorney-client privilege; (3) Work product and trial preparation materials; (4) Trade secrets; (5) Scope of requests; and (6) Fifth Amendment privilege.

In his Motion for Protective Order, Keller focuses on his assertion of the Fifth Amendment privilege. He claims that he previously testified at the section 341 meeting of creditors in the Debtors' chapter 11 cases, at a deposition in the chapter 11 cases, and at the trial on the Motion to Appoint a Chapter 11 Trustee. He further claims that he learned of the pending criminal investigation after providing the testimony, and that he has consistently asserted his Fifth Amendment privilege since that time. He seeks "the entry of a protective order shielding him from responding" to the Interrogatories and Request for Production. Alternatively, Keller requests a ruling that a response by Keller's attorney to the Interrogatories is sufficient, and that such a response does not violate Keller's privilege against self-incrimination or waive any attorney-client or work product privilege belonging to Keller.

The Plaintiff filed a motion to compel Keller to respond to the discovery requests. The Plaintiff contends that Keller is improperly invoking the Fifth Amendment privilege because his assertion of the privilege is overly broad, and because he has not shown that his responses to specific requests would present a real threat of incrimination. The Plaintiff further contends that the documents requested are the Debtors' corporate records, and that Keller therefore cannot decline to produce them on the basis of the "collective entity" theory. Finally, the Plaintiff asserts that the Court should strike Keller's answer and affirmative defenses pursuant to § 90.510 of the Florida Statutes because the requested communications are necessary to the Plaintiff.

## I. General Principles

... nor shall be compelled in any criminal case to be a witness against himself.... U.S. CONST. amend. V.

■ The United States Supreme Court set forth general principles regarding the invocation of the Fifth Amendment privilege against self-incrimination in *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). The following passage is worthy of repetition in its entirety.

> The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime. (Citation omitted). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. (Citation omitted). The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, (citation omitted), and to require him to answer if "it clearly appears to the court that he is mistaken." (Citation omitted). However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." (Citation omitted).

*Hoffman v. United States*, 341 U.S. at 486–87, 71 S.Ct. 814.

■ An understanding of *Hoffman* begins with the principle that the trial court exercises the power to make determinations regarding whether the privilege has been properly invoked in a particular case, and that the trial court makes the decision on the basis of all matters in the record, the context of the information requested, and the judge's own personal perceptions of the details of the case. *Hoffman*, 341 U.S. at 486–87, 71 S.Ct. 814. "It is for the court to decide" whether a witness' silence, or his invocation of the Fifth Amendment is justified. *In re Lindsey*, 229 B.R. 797, 801 (10th Cir. BAP 1999); *Scarfia v. Holiday Bank (In re Scarfia)*, 129 B.R. 671, 674 (M.D.Fla.1990). "[T]he determination of that assertion's propriety where challenged, as here, rests 'upon the trial court, guided by its own perception of the case's facts.'" *In re ICS Cybernetics, Inc.*, 107 B.R. 821, 829 (Bankr.N.D.N.Y. 1989).

■ The provision in the Fifth Amendment which establishes the privilege against self-incrimination is to be liberally construed "in favor of the right it was intended to secure." *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814. "The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime." *Id.* at 490, 71 S.Ct. 814 (quoting *United States v. White*, 322 U.S. 694, 698, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944)).

■ In view of the liberal construction of the provision, after a witness has asserted the privilege, he should be compelled to provide the requested information only if it "clearly appears" to the court that the witness is mistaken in his invocation of the privilege. *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814. "It is for the court to decide whether a witness' silence is justified and to require him to answer if it clearly appears to the court that the witness asserting the privilege is mistaken as to its validity." *In re Lindsey*, 229 B.R. at 801

(quoting *Bank One v. Abbe,* 916 F.2d 1067, 1077 (6th Cir.1990)). Significantly, in *Hoffman* the Supreme Court found:

> In this setting it was not "perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency" to incriminate.

*Hoffman,* 341 U.S. at 488, 71 S.Ct. 814.

■ Notwithstanding the liberal construction of the privilege, however, a witness is not necessarily entitled to the claim on the strength of his own assertion. "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination." *Id.* at 486, 71 S.Ct. 814. "It is axiomatic that a debtor may not cloak himself with the fifth amendments protection against self-incrimination simply by a blanket assertion that his answers to interrogatories, requests for admissions and requests for production of documents will tend to incriminate him." *In re Scarfia,* 129 B.R. at 674.

■ Instead, the privilege is limited to cases in which the witness "has reasonable cause to apprehend danger from a direct answer." *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814. "The person invoking the privilege must establish that the risk of incrimination resulting from their testimonial communications must be 'substantial and real' and not trifling or imaginary haphazards of communication." *In re Lindsey,* 229 B.R. at 801. To properly invoke the privilege, "a debtor must produce, for the court, credible reasons why his answers would incriminate him." *In re Scarfia,* 129 B.R. at 674. See also *In re Blan,* 239 B.R. 385, 392 (Bankr.W.D.Ark. 1999). The debtor must "substantiate his claim that responding to the specific requests for information may tend to incriminate him." *In re Wincek,* 202 B.R. 161, 165–66 (Bankr.M.D.Fla.1996) *aff'd* 208 B.R. 238.

■ Of course, if a witness were required to prove the danger of incrimination by the standard of proof typically necessary in a judicial proceeding, he may surrender the very protection that the privilege is intended to guarantee. *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814. Consequently, a witness' burden to justify the invocation of the privilege may be only "minimal," and the witness must explain how his answer will be incriminatory only "in a limited fashion." *In re Lindsey,* 229 B.R. at 801; *In re ICS Cybernetics,* 107 B.R. at 828 (quoting *In re Endres,* 103 B.R. 49, 53–54 (Bankr.N.D.N.Y.1989)). Further, the witness is not required to establish that criminal prosecution is probable or imminent. Instead, the court must only be satisfied that "there is a reasonable possibility" that the witness' answer will be used against him. *In re ICS Cybernetics,* 107 B.R. at 828.

## II. Reasonable Cause to Apprehend Danger

■ In this case, the Plaintiff primarily seeks to avoid transfers from the Debtors to various Trusts created for the benefit of officers, employees, and persons who performed services for the Debtors.

In the Interrogatories, the Plaintiff requests information regarding the creation of the Trusts, and the transfer of funds from the Debtors to the Trusts and from the Trusts to Keller. The Plaintiff also requests information regarding Keller's employment with the Debtors and the Debtors' payment of dividends to shareholders. The Plaintiff often requests information concerning the "reasons" that a particular action was taken, such as the reason Keller allowed the Trusts to be created, the reason Keller entered an employment agreement with the Debtors, and the reason the Debtors stopped making dividend payments to their shareholders.

In the Request for Production of Documents, the Plaintiff requests documents regarding the creation of the Trusts, the employment of the beneficiaries of the

Trusts, transfers from the Trusts, and the Debtors' financial condition at the time of the transfers.

Keller asserts that he believes that he may be the target of a pending criminal investigation because he learned that a search warrant was executed on the office and residence of the Debtors' former attorney, because his attorney received information from FBI agents indicating that Keller may be the target of a criminal investigation, because FBI agents and representatives of the United States Attorneys' office have attended hearings in this Court, and because an assistant United States Attorney advised Keller's attorney that, in his opinion, Keller may be indicted. According to Keller, the assistant United States Attorney indicated that the charges in any indictment would relate to bankruptcy fraud and certain of the Debtors' prebankruptcy transactions.

The Court is aware of certain "peculiarities of the case" that affect its appraisal of Keller's claim of privilege as to the discovery requests described above. *Hoffman,* 341 U.S. at 487, 71 S.Ct. 814. Prior to the filing of the bankruptcy petitions, the Debtors were engaged in the business of purchasing retail motor vehicle installment sales contracts. The Debtors raised the funds to acquire the contacts from individual investors, primarily through the sale of secured notes. According to representations made to the investors at the time of the sales, the notes were to be secured by the vehicle installment sales contracts as well as by the actual vehicles sold. Typically, an Indenture Trustee was named to hold the notes and security documents in trust on behalf of the investors. More than 7,000 investors, many of whom were retirees, purchased secured notes from the Debtors. The Debtors also raised funds through the issuance of preferred stock.

Between 1992 and 1996, the Debtors raised in excess of $150,000,000 from the sale of secured notes and the issuance of stock. At the time that the Chapter 11 cases were filed in April of 1998, the Debt-

ors listed total liabilities in excess of $143,000,000, and total assets of less than $41,000,000. In the months prior to the filing of the petitions, various transfers of the Debtors' funds were made, including the transfer of the sum of $3,200,000 to an account held by Dominic Massari, the Debtors' attorney.

Brian Keller was a shareholder, president, and/or director of the Debtors at the time that the secured notes were sold, and also at the time that funds were transferred from the Debtors' accounts.

Finally, the Court is also aware that search warrants were executed on the office and residence of Domenic Massari, the Debtors' former attorney, in connection with a criminal investigation, and that extensive records were seized and are in the possession of the government. (See, for example, Transcript, Hearing on Trustee's Motion for Entry of Order Finding Massari & Bell, P.A., in Contempt of Court for Willful Failure to Comply with Court Order, October 25, 1999; and Letter from Todd Foster to Mike E. Runyon, AUSA, dated April 16, 1999, regarding "Search of Massari Law Group Office," Trustee's Exhibit 18, Final Evidentiary Hearing on Motion for Debtors' Attorney to Return Excessive Payments.).

In view of the foregoing, the Court determines that Keller has shown that he has "reasonable cause to apprehend danger" that his responses to the discovery requests may incriminate him. *Hoffman,* 341 U.S. at 486, 71 S.Ct. 814. The Court is satisfied that Keller has reasonable cause to believe that a criminal investigation is pending, and that the investigation relates to transactions with the Debtors that occurred at a time when Keller was a chief decision-maker and principal of the Debtors.

The Court further finds that a nexus exists between the specific discovery requests by the Plaintiff and the ongoing criminal investigation. The requests seek information concerning transfers of the

Debtors' funds in the period prior to the filing of the Chapter 11 petitions, and it appears that either those transfers or similar transfers may be the subject of the criminal investigation. The situation is not like that in *In re Blan*, 239 B.R. 385 (Bankr.W.D.Ark.1999), for example, in which the criminal investigation involved the debtor's dealings with a hospital, but the discovery requests pertained to the debtor's bankruptcy petition, schedules, and statement of affairs, and not his involvement with the hospital. Under those circumstances, the court determined that the debtor had not provided credible reasons to explain his refusal to answer questions that were apparently unrelated to his involvement with the hospital. *In re Blan*, 239 B.R. at 393.

As indicated above, Keller has offered to provide certain information requested by the Plaintiff, consisting in part of "the identities of witnesses, documents, and facts which support the defenses raised" by him, provided that such production may not be deemed a waiver of any privilege possessed by Keller. Consistent with Keller's offer, and given the nature of the information to be provided, the Court finds that it is appropriate to direct Keller to respond to the Interrogatories numbered 2 through 4, and to direct Keller to identify all persons that he intends to call or may call as a witness at trial (Interrogatory 14) and all expert witnesses that he intends to call or may call at trial (Interrogatory 16). Additionally, it is appropriate to direct Keller to produce the documents requested in numbers 19 and 20 of the Request for Production, and to produce all documents listed on any exhibit list filed or served by him (Request 21) and all documents that he intends to use or may use at trial (Request 22). No responses or production made pursuant to this Order shall constitute a waiver of any valid privilege possessed by Keller.

Apart from the responses and production required in the previous paragraph, it does not "clearly appear" to the Court that

Keller was mistaken in his assertion that his responses to the discovery requests may incriminate him. *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814. In the setting in which the requests are made, and in the context of the peculiarities of this case, it is not clear that Keller's answers cannot possibly have a tendency to incriminate him. *Id.* at 488, 71 S.Ct. 814.

Since Keller had reasonable cause to apprehend danger, he properly invoked his Fifth Amendment privilege, and therefore is not required to respond to the remainder of the Interrogatories propounded by the Plaintiff.

### III. The Act of Production

The rule regarding the application of the Fifth Amendment privilege to the act of producing records has been clearly stated.

█ The Fifth Amendment is intended to protect persons only against compelled self-incrimination. *United States v. Doe*, 465 U.S. 605, 610, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (citing *Fisher v. United States*, 425 U.S. 391, 396, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)).

█ Where the initial preparation of records is voluntary, however, no compulsion is present. *United States v. Doe*, 465 U.S. at 610, 104 S.Ct. 1237. If the preparation of the papers is wholly voluntary, they cannot contain compelled testimonial evidence. *Fisher v. United States*, 425 U.S. at 409–10, 96 S.Ct. 1569. Consequently, "the Fifth Amendment does not protect the contents of voluntarily prepared documents, either business or personal." *In re Hyde*, 235 B.R. 539, 543 (S.D.N.Y.1999) (citing *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 93 (2d Cir.1993)). "If the creation of documents or records is voluntary, the element of compulsion does not exist and, therefore, the contents of such documents or records are not privileged." *In re DG Acquisition Corp.*, 208 B.R. 323, 327 (Bankr.S.D.N.Y.1997).

■ Even though the contents of a document may not be privileged, however, the act of producing the document may be protected by the Fifth Amendment. *United States v. Doe*, 465 U.S. at 612, 104 S.Ct. 1237. See also *In re Hyde*, 235 B.R. at 543 ("Even if the contents of documents are not privileged, however, the act of producing those documents might be."), and *In re DG Acquisition Corp.*, 208 B.R. at 327 ("However, while the contents of certain documents or records may not be privileged, 'the act of producing them may be.' "). "The Supreme Court has recognized that while the contents of a document may not be privileged, the act of production of subpoenaed documents may be considered testimony and, thus, protected under the Fifth Amendment." *Id.* at 329–30.

■ The determination of whether the act of producing documents is privileged depends on two factors: (1) whether the production would be testimonial in nature, and (2) whether the production would be in incriminating.

"Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [person claiming the privilege]. It also would indicate the [person's] belief that the papers are those described in the subpoena. (citation omitted) The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the [person] are both 'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment."

*United States v. Doe*, 465 U.S. at 613, 104 S.Ct. 1237 (quoting *Fisher v. United States*, 425 U.S. at 410, 96 S.Ct. 1569). See also *In re Hyde*, 235 B.R. at 543 (The District Court found that the Supreme Court had "reviewed the application of that privilege to the act of producing the documents and determined that in order to implicate the Fifth Amendment, production would have to be both 'testimonial' and 'incriminating.' ")

The rule in the Second Circuit to determine whether individuals may invoke the "Act of Production" doctrine uses a two part test. (citation omitted). First, the court must determine whether the production of documents would be testimonial. (citation omitted). Second, the subpoenaed party must demonstrate that the summoned documents are incriminating.

*In re DG Acquisition Corp.*, 208 B.R. at 330.

■ The determination of whether production is testimonial and incriminating depends on the facts and circumstances of the particular case. *United States v. Doe*, 465 U.S. at 613, 104 S.Ct. 1237 (quoting *Fisher v. United States*, 425 U.S. at 410, 96 S.Ct. 1569). Accordingly, no formula exists to guide the decision. Several courts, however, have attempted to identify factors involved in the determination.

While the contents of voluntarily prepared documents are not privileged, the act of producing them in response to a subpoena may require testimony in two situations: (1) "if the existence and location of the subpoenaed papers are unknown to the government"; or (2) where production would "implicitly authenticate" the documents.

*In re Hyde*, 235 B.R. at 544 (quoting *United States v. Fox*, 721 F.2d 32, 36 (2d Cir.1983)). See also *In re DG Acquisition Corp.*, 208 B.R. at 330–32, in which the Court determined that two factors should be examined to determine whether production is testimonial. The two factors consist of whether the trustee or government is aware of the existence and control of the documents, and whether production would "implicitly authenticate" the documents.

■ Further, to determine whether production of the documents is incriminating, the issue is not whether the documents establish that a crime was committed. Instead, the test is only whether the documents are potentially incriminating, or form a link in a chain of evidence. *In re*

*DG Acquisition Corp.*, 208 B.R. at 332. The District Court in *Hyde* resolved the issues as follows:

> [T]his Court concludes that enforcement of the subpoenas would compel Hyde to admit at a minimum that the Finax documents exist, that they are in his possession, and that they are in fact the documents produced. These concessions could establish that the documents are authentic and likely admissible against him. See Fed.R.Evid. 901. Without regard to the contents of specific documents, production of those documents would be both testimonial and incriminating, and a "necessary link to incriminating evidence" found within.

*In re Hyde*, 235 B.R. at 548.

■ In this case, the Court determines that production of Keller's personal records is privileged. As described above, the documents requested by the Plaintiff generally relate to the creation, funding, and disposition of certain Trusts established for the benefit of the Debtors' employees. There is no suggestion that the documents were not prepared voluntarily, with the result that the contents of the documents are not inherently privileged.

It does appear, however, that Keller's production of the documents may be both testimonial and within the meaning of *United States v. Doe* and the cases arising thereunder. The Plaintiff's requests in many instances are broad, seeking "all documents" regarding various aspects of the Trusts. The requests do not identify specific documents prepared by specific individuals on specific dates. Given the lack of specificity in the requests, the Court cannot conclude that the Plaintiff is aware of any particular document that Keller would produce in response to the requests, or that the documents are known to the Plaintiff. Instead, the broad, inclusive categories of requests indicate that the Plaintiff is attempting to discover documents that are unknown to him. Accordingly, production of the documents may constitute a statement concerning the existence and location of the documents.

Further, the Court finds that the documents may be "incriminating" under the standard applicable for Fifth Amendment purposes. As set forth above, it is not required that the documents actually prove that a crime was committed to be "incriminating." It is only necessary that the documents be potentially incriminating, or form a link in the chain that leads to incriminating evidence. *In re DG Acquisition Corp., supra.*

In this case, the Court previously determined that Keller has reasonable cause to believe that his answers to the discovery requests may incriminate him. The finding was based in part on the Court's background knowledge of the Debtors, and also on Brian Keller's reasonable belief that a criminal investigation into the Debtors' transactions is pending. Keller was a principal of the Debtors at the time that certain of the transactions occurred. Consequently, without determining whether the documents appear to be on their face, the Court concludes that any documents produced by Keller in response to the Plaintiffs requests may be for purposes of assessing Keller's privilege.

In conclusion, even though the contents of the requested documents may not be privileged since they were voluntarily created, the act of producing Keller's personal records is privileged since such production may be both testimonial and incriminating. *United States v. Doe, supra.* As shown below, however, the "act of production" privilege applies only to Keller's personal records, and not to any corporate records in his possession, since any of the Debtors' corporate records requested by the Plaintiff may fall within an exception to the doctrine.

### IV. Collective Entity Doctrine

The Plaintiff contends in his Motion to Compel Discovery that "[t]he documents requested in all likelihood are records of the Debtors which B. Keller took at or

before the time his position as their officer and director was terminated. As such, the records are corporate records owned by the Debtors, and under the 'collective entity' doctrine, B. Keller cannot refuse production by asserting a fifth amendment privilege."

■ The United States Supreme Court explained the "collective entity" doctrine in *Braswell v. United States*, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). The Supreme Court ruled in that case that a custodian of corporate records may not resist a subpoena for the corporate records on the ground that the act of production would incriminate him in violation of the Fifth Amendment. In *Braswell*, the custodian was an officer, director, and shareholder of the corporation. *Braswell* 487 U.S. at 100, 108 S.Ct. 2284.

■ The "collective entity" doctrine is premised on the principle that artificial entities such as corporations are not protected by the Fifth Amendment privilege. *Braswell*, 487 U.S. at 102, 108 S.Ct. 2284. The privilege applies only to individuals, and not to corporations or other "collective entities." "The Supreme Court has held that a corporation has no Fifth Amendment privilege to refuse to produce its records." *In re Grand Jury Subpoena Dated November 12, 1991*, 957 F.2d 807, 810 (11th Cir.1992) (citing *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906)).

■ Further, a custodian of corporate records holds the records in a representative capacity rather than a personal capacity. *Braswell* 487 U.S. at 109–10, 108 S.Ct. 2284. "The rule in Braswell was predicated on the rationale that corporate custodians hold and produce documents only in a representational capacity." *In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*, 191 F.3d 173, 181 (2d Cir.1999).

■ "Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege." *Braswell*, 487 U.S. at 110, 108 S.Ct. 2284. Accordingly, the contents of corporate records are not privileged. *Id.* at 102, 108 S.Ct. 2284. A corporate officer may not decline to produce corporate documents on the ground that the act of production might tend to incriminate him. *Id.* at 119, 108 S.Ct. 2284.

■ *Braswell* involved a custodian who was a current officer or agent of the corporation. The issue has arisen, however, as to whether a former officer of the corporation may assert the privilege with respect to corporate records that are in his possession.

The Circuit Courts of Appeal do not appear to be in agreement on the issue. In *In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999*, 191 F.3d 173 (2d Cir.1999) and *In re Grand Jury Proceedings*, 71 F.3d 723 (9th Cir. 1995), for example, the Circuit Courts of Appeal found that the collective entity rule did not apply to former employees of corporations who were no longer acting as representatives of the corporations.

The Eleventh Circuit Court of Appeals, however, addressed the issue in *In re Grand Jury Subpoena Dated November 12, 1991*, 957 F.2d 807 (11th Cir.1992), and held:

> [A] custodian of corporate records continues to hold them in a representative capacity even after his employment is terminated. It is the immutable character of the records as corporate which requires their production and which dictates that they are held in a representative capacity. Thus, the production of such documents is required regardless of whether the custodian is still associated with the corporation or other collective entity.

*In re Grand Jury Subpoena,* 957 F.2d at 812.

The Eleventh Circuit discussed the origins of the collective entity doctrine:

> The law is clear that an individual may not invoke his personal Fifth Amendment privilege to avoid producing the documents of a collective entity that are in his custody, even if his production of those documents would prove personally incriminating. . . .

> The Supreme Court has held that a corporation has no Fifth Amendment privilege to refuse to produce its records. (citation omitted). Because a corporation can only its records through its human representatives, the corollary to this rule is that a corporate representative may not invoke his personal Fifth Amendment privilege to shield corporate records from a subpoena. (citation omitted). This principle is known as the "collective entity doctrine," . . . .

*In re Grand Jury Subpoena,* 957 F.2d at 809–10.

The Court then framed the issue as "whether the district court properly held that the production of purely corporate records is not protected by the Fifth Amendment, even when the custodian's employment is terminated after he acquires custody of the corporate records, and even though the custodian claim that he had 'personal reasons' for acquiring and maintaining the records." *Id.* at 809.

The Eleventh Circuit found that "though Braswell involved a custodian of corporate records who was a current officer of the corporation, the collective entity doctrine does not provide for any exception for former employees." *Id.* at 811. The Court acknowledged that "[o]ther courts considering the act of production privilege have recognized that, in light of the continuing vitality of the collective entity doctrine, a custodian of corporate records has no Fifth Amendment privilege to refuse to produce corporate records merely because his association with the corporation has terminated by the time of the issuance of the subpoena." *Id.* at 811 (citations omitted). The Court concluded that production of corporate records is required regardless of whether the custodian is associated with the collective entity at the time that the production is requested. *Id.* at 812.

In this case, it is clear that Brian Keller left the Debtors' employment prior to the time that the discovery requests were served. However, in view of the decision of the Eleventh Circuit Court of Appeals in *In re Grand Jury Subpoena Dated November 12, 1991, supra,* the Court concludes that Brian Keller is required to produce those documents described in the Plaintiff's Request for Production that are corporate records of the Debtors or the Debtors' affiliates.

## V. Motion to Strike Answer and Affirmative Defenses

The Plaintiff contends that the fraudulent transfer claims at issue in this case are state law causes of action. According to Rule 501 of the Federal Rules of Evidence, therefore, the Plaintiff claims that state law governs the effect of Keller's invocation of his Fifth Amendment privilege. The Plaintiff further contends that § 90.510 of the Florida Statutes supplies the applicable rule in this case. That section provides:

> 90.510. Privileged communication necessary to adverse party

> In any civil case or proceeding in which a party claim a privilege as to a communication necessary to an adverse party, the court, upon motion, may dismiss the claim for relief or the affirmative defense to which the privileged testimony would relate. In making its determination, the court may engage in an in camera inquiry into the privilege.

The Plaintiff contends that the information requested from Keller is necessary for his trial preparation, and that Keller's answer and affirmative defenses therefore should be stricken in accordance with the statute.

■ The Court determines that the Plaintiffs request to strike Keller's pleadings should be denied. Specifically, the Court finds that the remedy of striking a party's pleading based on his invocation of the Fifth Amendment privilege is generally appropriate only where the party invoking the privilege is seeking affirmative relief.

It is well settled in this district that a person may not seek affirmative relief in a civil action and then invoke the fifth amendment to avoid giving discovery, using the fifth amendment as both a "sword and a shield."

*DePalma v. DePalma*, 538 So.2d 1290 (Fla. 4th DCA 1989). In *DePalma*, the Court further concluded that "the sword and shield test is not whether the party raising the privilege is a defendant or a plaintiff, ... but whether the person is seeking affirmative relief, no matter what his designation as a party." *DePalma*, 538 So.2d at 1291.

Other courts have adopted the "sword and shield" principle. In *Kerben v. Intercontinental Bank*, 573 So.2d 976, 978 (Fla. 5th DCA 1991), for example, the Court recognized that courts frequently dismiss a plaintiffs action or strike the plaintiffs pleadings in a civil action if the plaintiff invokes the fifth amendment privilege. "On the other hand, where a defendant has invoked the Fifth Amendment privilege against self-incrimination he will usually not suffer a similar detriment because a defendant is not generally seeking affirmative relief and is before the court involuntarily." *Kerben*, 573 So.2d at 978. Additionally, the Court in *DeLisi v. Bankers Insurance Company*, 436 So.2d 1099 (Fla. 4th DCA 1983) described the "sword and shield" principle as incorporating the rule that a plaintiff may not seek affirmative relief in a civil action and subsequently invoke the Fifth Amendment to avoid providing discovery relevant to the litigation. An assertion of an affirmative defense by a defendant, however, does not constitute a request for affirmative relief sufficient to allow application of the principle. *DeLisi*, 436 So.2d at 1100.

In fact, the "sword and shield" principle has been acknowledged in specific connection with § 90.510 of the Florida Statutes. In *In re Forfeiture of $13,000 U.S. Currency*, 522 So.2d 408, 409 (Fla. 5th DCA 1988), the Court held that the section did not apply in a forfeiture case in which the state claimed that privileged information was necessary to assert a claim for forfeiture against the person claiming the privilege. In reaching this conclusion, the Court recognized case law establishing that "a defendant's legitimate invocation of the privilege against self-incrimination in opposition to a discovery request may not be punished by rendering a default judgment in favor of the plaintiff." *In re Forfeiture*, 522 So.2d at 410.

■ In this case, Keller is a defendant in the adversary proceeding commenced by the Plaintiff, and has asserted affirmative defenses in the action. Keller has specifically represented that "he seeks no affirmative relief in connection with this litigation, but merely desires to defend the allegations made against him." (Keller's Supplement to Plaintiff's First Interrogatories, p. 3). In view of the authorities cited above, the Court determines that striking Keller's pleadings is not an appropriate remedy, since he is not the party seeing affirmative relief in the proceeding.

The Plaintiff cited two cases in support of his Motion to Strike. Neither case refers to § 90.510 of the Florida Statutes. Further, both cases appear to support the Court's conclusion that a party's pleadings should not be stricken based on his assertion of the Fifth Amendment privilege if he is not asserting any claim for affirmative relief. *Rollins Burdick Hunter of New York, Inc. v. Euroclassics Limited Inc.*, 502 So.2d 959, 962 (Fla. 3rd DCA 1987) ("A civil litigant's fifth amendment right to avoid self-incrimination may be used as a shield but not a sword. This means that *a plaintiff seeking affirmative relief* in a civil action may not invoke the

fifth amendment and refuse to comply with the defendant's discovery requests, thereby thwarting the defendant's defenses.") (Emphasis supplied); *Eatmon v. Bonagura,* 590 So.2d 4 (Fla. 1st DCA 1991) (A respondent should be relieved of prejudice where a *claimant* has invoked the Fifth Amendment).

The Plaintiff's Motion to Strike Answer and Affirmative Defenses should be denied.

## VI. Conclusion

In conclusion, the Court determines that Brian Keller should respond to the items numbered 2 through 4 of the Interrogatories propounded by the Plaintiff, and produce the documents requested in the items numbered 19 and 20 of the Plaintiff's Request for Production, consistent with the representation in Keller's Supplement to his Response to Plaintiff's First Interrogatories. Additionally, Keller should respond to items 14 and 16 of the Plaintiffs Interrogatories and items 21 and 22 of the Request for Production. No responses or production made pursuant to this Order shall constitute a waiver of any valid privilege possessed by Keller.

Brian Keller is not required to respond to the remainder of the Interrogatories, since the Court finds that Keller has a "reasonable cause to apprehend danger" that his responses to the Interrogatories may incriminate him, and since it does not clearly appear to the Court that Keller is mistaken in his assertion that his responses may incriminate him.

Further, the Court determines that Brian Keller should not be required to produce any personal records in his possession that are responsive to the Plaintiff's Request for Production, since Keller's act of producing such documents may be both testimonial and incriminating in nature. Consequently, Keller is entitled to assert his Fifth Amendment privilege against self-incrimination with respect to the production of such personal records in accordance with the "act of production" doctrine.

Pursuant to the "collective entity" doctrine, however, Brian Keller should be required to produce all corporate records in his possession that are responsive to the Request. Consistent with Eleventh Circuit authority, the Court concludes that Keller holds such documents only in a representative capacity for the Debtor corporations, regardless of whether his association with the Debtors had terminated prior to the Request, and the Debtor corporations possess no Fifth Amendment privilege.

The Plaintiff's Motion to Strike Keller's Answer and Affirmative Defenses should be denied. Brian Keller is a defendant in this action, is not seeking any affirmative relief, and therefore is not attempting to use the Fifth Amendment in violation of the "sword and shield" principle.

Accordingly:

**IT IS ORDERED** that:

1. The Motion for Protective Order filed by the Defendant Brian R. Keller, and the Motion to Compel Discovery or Alternatively to Strike Answer and Affirmative Defenses of Brian R. Keller filed by the Plaintiff, Kevin O'Halloran, as Trustee of Keller Financial Services of Florida, Inc., are granted in part and denied in part as set forth in this Order.

2. Brian R. Keller is directed to serve written responses to Interrogatory Numbers 2, 3, 4, 14, and 16 of the Plaintiff's First Interrogatories, and to produce the documents requested in items numbered 19, 20, 21, and 22 of the Plaintiff's First Request for Production of Documents, within twenty (20) days of the date of this Order. No responses or production made pursuant to this Order shall constitute a waiver of any valid privilege possessed by Keller.

3. Brian R. Keller is not required to respond to the remainder of the Plaintiff's First Interrogatories to Brian R. Keller.

4. Brian R. Keller is directed to produce, within twenty (20) days of the date of this Order, all corporate documents in his possession or control that are responsive to the Plaintiff's First Request for Production.

5. The Motion to Strike Answer and Affirmative Defenses is denied.